398 So.2d 432 (1981)
Robert Fieldmore LEWIS, Appellant,
v.
STATE of Florida, Appellee.
No. 50851.
Supreme Court of Florida.
April 2, 1981.
Rehearing Denied June 10, 1981.
*433 Theodore E. Mack, Asst. Public Defender, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is before the Court on appeal of a judgment of the Circuit Court of the Fourth Judicial Circuit, Duval County. The appellant was convicted of the first-degree murder of Joseph Lynwood Richards and was sentenced to death. This Court has *434 jurisdiction of the appeal. Art. V, § 3(b)(1), Fla. Const.

I. FACTS
On the night of January 27, 1976, Joseph Richards and two visitors were watching television in the bedroom of Richards' home in Jacksonville. At approximately 9:40 P.M. two attackers simultaneously fired upon him from outside the bedroom window, using a .30-.30 rifle and a 12-gauge shotgun. Richards received multiple rifle and shotgun wounds and died instantly. Shortly afterwards, one of Richards' friends called the police. Among the items of evidence gathered at the scene were several spent bullet casings and shotgun shells, recovered from the general area outside the window where the gunmen stood.
The principal evidence against appellant was the testimony of Charles Jimmy Carter. Originally indicted for first-degree murder, Carter was granted immunity from prosecution for his participation in the crime and identified appellant as one of the murderers.
Carter testified that appellant and Eddie Odom asked him to help them kill Richards by driving a van, to be supplied by appellant, to Richards' home. They also borrowed a 12-gauge shotgun from him, and he testified that this shotgun was one of the murder weapons. According to Carter's testimony, he drove a bright pink Chevrolet van to Richards' house, where Odom, carrying a rifle, and appellant, carrying the shotgun, got out and walked up to the house. A few minutes later, Carter said, he heard the shots and the two men came running back to the van and got in. Carter testified that as they were riding away from the scene, appellant said he could not directly see the victim's head but he shot through the headboard of Richards' bed, aiming at the point where he thought the man's head would be judging from the position of his body on the bed.
Carter testified that he then drove the van to the Main Street bridge over the Trout River. From the bridge, Odom and appellant Lewis threw their gloves and shoes in the river and Carter threw the rifle in. Carter then took Odom home and then drove himself home. Carter took the shotgun home with him and appellant drove away in the van.
Carter testified that Joseph Richards had threatened appellant's life because of a dispute over money. Appellant denied that he owned Richards any money and had in turn threatened Richards' life. There was testimony from other witnesses also about appellant's ill will toward Richards.
Carter testified that in addition to receiving immunity from prosecution for his participation in the murder, he also received, in exchange for his agreement to tell what he knew, a reduction of a previously imposed five-year sentence for a separate offense to one year; an agreement not to prosecute him on a charge that arose out of a fight; and an agreement by officials to try to get a reduction in a term of parole he had been serving.
With information obtained from Carter, the police recovered the rifle and the shotgun. Three spent .30-.30 cartridge casings were recovered from the scene. From the rifle retrieved from the river another spent casing and a live bullet were recovered. A firearms examiner testified that the casings recovered at the scene and the one found in the rifle were all discharged in the same weapon. Therefore, although because of corrosion in the rifle he was unable to positively say that the recovered rifle was that weapon, the inference that it was the murder weapon was strong. The examiner also testified that he concluded that the shotgun shells found at the scene were fired by the shotgun identified by Carter as the one he supplied to appellant.
During the period of time surrounding the murder, appellant was living at his parents' home and a seventeen-year-old girl was living there with him. The girl testified at trial that shortly after 10:00 P.M. on the night of January 27, 1976, appellant arrived home, changed clothes, and instructed her and his mother to dispose of the clothes he had been wearing. He also told *435 them, she said, to tell anyone who might ask that he had been at home all evening. The girl testified that he also told her that now he would not have to worry about Joe Richards slapping his face anymore.

II. ISSUES ON APPEAL OF THE JUDGMENT OF CONVICTION
Appellant contends that the evidence was insufficient to support the jury's verdict of guilty of murder in the first degree. He argues that the only evidence of his participation in the crime was the uncorroborated testimony of Carter. He argues that the testimony of Carter, who participated in the murder, was inherently unreliable when seen in light of his immunity agreement and the other benefits afforded him by the state. We find this contention to be without merit. The testimony of Carter, even though he was an accomplice, was competent evidence which the jury could consider, according it such value as they might find it to have. That Carter had direct knowledge of the crime was demonstrated by his directing police to the murder weapons. His testimony that appellant was one of the perpetrators was corroborated by the testimony of appellant's teenage girlfriend as to his activities and statements on the night of the murder. We conclude that there was competent, substantial evidence upon which the jury could reasonably base a conclusion that appellant's guilt was proved beyond a reasonable doubt.
Appellant contends that the trial court erred in the way it handled a request by the jury to listen to some trial testimony a second time. The trial transcript reveals that the following took place when the jury was preparing to begin deliberating:
THE COURT: ...
Okay. Mr. Foreman, we hand these to you, and you may now retire to deliberate on your verdict, and the evidence will be brought to you in one moment.
JUROR SHEPHERD: One thing. Is there any way that we can get the testimony of any of the various witnesses?
THE COURT: You mean read back?
JUROR SHEPHERD: Yes.
THE COURT: All of it?
JUROR SHEPHERD: No, not all of it, but some of it.
THE COURT: You start deliberating and then decide what you need and then I'll have to rule upon it at that time. (Jury retired to deliberate at approximately 5:07 o'clock p.m., October 29, 1976.)
Trial transcript at 990-91. The transcript shows that then, the following transpired:
(Jury buzzed at approximately 5:35 o'clock p.m., October 29, 1976).
THE COURT: As I understand, they have a question?
(Defendant present.)
THE COURT: Bring them out and just let them stand here and then we will decide what we're going to do.
(Jury returned to courtroom at approximately 5:40 o'clock p.m., October 29, 1976.) (Jury present.)
THE COURT: Ladies and gentlemen of the jury, as I understand, you have a question?
FOREMAN CARSWELL: Yes, Your Honor. We'd like the use of a yardstick, a city map and the testimonies of several of the witnesses.
THE COURT: Well, indulge me just a moment.
(Counsel for the State and defendant approached the bench.)
THE COURT: Ladies and gentlemen of the jury, you are confined in your deliberations to those matters which are in evidence, and we cannot provide you  not that we don't have them accessible  but we cannot provide you with a city map or a yardstick. Those matters are not in evidence and they will not be used by you in deliberating on your verdict.
As to testimony, do you know which ones you want, or do you want to go ahead and deliberate and then give me a list of all that you want, or  you have it there?
FOREMAN CARSWELL: Yes, sir.
THE COURT: All right. Tell me which ones they are.

*436 FOREMAN CARSWELL: The sworn testimony of Jimmy Carter, Debbie Furman, Ann Robinson, Steve Carter, Mrs. Lewis, the rebuttal of Officer Japour and the testimony of Michael Riley.
THE COURT: Suppose you step back to your jury room and we will call you out in just a few moments. (Jury absent.)
THE COURT: Gentlemen, I heard the request. I will be happy to hear you on it. Keeping in mind that we have gone through thirty-three witnesses and I guess it's not unreasonable to  perhaps they forgot and they want to have their memory refreshed on some witnesses' testimony.
What say you, Mr. Dempsey? It's sort of  it cuts both ways. They sort of wanted to hear State's  some of the State's and some of yours.
MR. DEMPSEY: Your Honor, from what I understand, they're asking for the testimony of about five witnesses, which is about a sixth of all the witnesses. I don't have any objection to it.
THE COURT: Mr. DuBray?
MR. DuBRAY: I don't have any, Your Honor.
THE COURT: All right, you gentlemen want to brace yourselves to go through this.
Mr. Alternate Juror, you will be listening to it, of course, also.
Maggie, how far 
REPORTER: Judge, it will take me a few minutes to go back through my notes and locate the witnesses and mark them.
THE COURT: Okay.
Are you ready now?
REPORTER: Yes, sir.
THE COURT: Bring out the jury. (Jury returned to courtroom at 6:00 o'clock p.m.) (Jury present.)
THE COURT: Now, ladies and gentlemen of the jury, Mr. Foreman, you asked for certain witnesses' testimony. Did you have any particular preference in which you wish to hear them?
FOREMAN CARSWELL: Yes, Your Honor. I believe Jimmy Carter's should be first.
THE COURT: Do you have that available?
REPORTER: Yes, sir.
THE COURT: Do you want Jimmy Carter first?
FOREMAN CARSWELL: Yes.
THE COURT: All right. Maggie, can you find that?
REPORTER: Yes, sir.
THE COURT: In talking with Maggie before you came out, we were looking at it and estimated that his testimony would take approximately an hour.
Is that correct, Maggie?
REPORTER: Yes, sir.
FOREMAN CARSWELL: Well, the thing I think we are most interested in is his activities prior to 8:00 o'clock on the alleged night.
THE COURT: Well, all we can do is have his testimony read. We can't take just portions of it.
All right. Proceed, Maggie.
(Court Reporter reads the testimony of Charles Jimmy Carter, as it began on page 345 of this transcript, up to page 366, line 16.)
FOREMAN CARSWELL: Your Honor, we believe that's enough of Jimmy Carter.
THE COURT: Gentlemen, step here. (Counsel for the State and defendant and court reporter approached the bench where the following proceedings were had out of the hearing of the jury:)
THE COURT: The jury has asked  stated that they've heard enough of the testimony of Mr. Carter. I've called the attorneys at bench and Mr. Dempsey feels as though he objects to reading just a portion and feels as though the entire portion of his testimony should be read because that's only the direct examination of Mr. DuBray, and I'm inclined to agree that he's right, and to read just a portion of it, I think, would be error, and we have to read the entire testimony.
THE COURT: Ladies and gentlemen of the jury, we cannot read just a portion *437 of the testimony, in fairness to both the State and the defense. If the testimony is to be read, it has to be read in its entirety, because to read just a portion of it might put an undue emphasis on that portion which is read, and minimizing something that is  or have you overlook something that you should also consider.
All right, Maggie, continue reading. We'll get you some water in just a minute. (Court reporter continues reading the remainder of the testimony of Charles Jimmy Carter, as it is reflected in this transcript, beginning on page 372, line 11, through page 467, line 1.)
REPORTER: That is all of the testimony of Charles Jimmy Carter.
THE COURT: All right, you have asked for some other testimony, but we will consider that after we 
FOREMAN CARSWELL: Yes, Your Honor. I think if we go back to the room, we can abbreviate some of those witnesses that we asked for.
THE COURT: I thought maybe you would.
...
THE COURT: You may step back to your room now.
(Jury retired for further deliberations at approximately 7:56 o'clock p.m., October 29, 1976.) (Jury absent.)
(Jury buzzed at approximately 8:42 o'clock p.m., October 29, 1976.) (Counsel for the State, defendant, and defendant Lewis present.)
BAILIFF SILLASEN: All they wanted to know is if at a later date they wanted to hear some more testimony, can they, but at this time they don't want to hear any more.
THE COURT: Fine. Tell them they can hear it any time that they want to.
Trial transcript at 992-98.
As the transcript shows, when the reading of Charles Jimmy Carter's testimony was completed, and the judge and jury agreed that the reading of testimony could then be discontinued until and unless the jury requested to hear the testimony of the other witnesses originally named by the jury foreman, defense counsel interposed no objection. The question of how to deal with the jury's request for reading of testimony was for the sound discretion of the judge. In the absence of any request by the defense to handle it any differently, it is impossible for this Court to say now that the judge abused his discretion. Appellant's argument on this issue is without merit.
Finding no error at the guilt-or-innocence phase of the trial, we affirm the judgment of conviction.

III. SENTENCE
Appellant contends that his sentence of death is invalid because Florida's capital felony sentencing law, section 921.141, Florida Statutes (1975), under which sentence was imposed, is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution. Appellant specifically asserts that the law allows for unguided discretionary sentencing, held impermissible in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). This Court has previously upheld the statute against precisely this kind of challenge, Raulerson v. State, 358 So.2d 826, 827 (Fla.), cert. denied, 439 U.S. 959, 99 S.Ct. 364, 58 L.Ed.2d 352 (1978); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), as has the United States Supreme Court. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2690, 49 L.Ed.2d 913 (1976). We reaffirm our previous holding and reject appellant's argument.
Appellant contends that he received ineffective assistance of counsel at the sentencing portion of the trial. In support of this argument he calls our attention to the fact that his attorney did not seek to present any evidence in mitigation and as argument made only a brief and generalized plea for a life sentence. Since the jury returned a recommendation of life imprisonment, however, we believe that trial counsel did as good a job as was possible under the circumstances. Therefore we find this contention to be without merit.
*438 We come now to the propriety of the sentence of death itself. The jury recommended a sentence of life imprisonment. The trial judge overruled the advisory sentence stating that there were a number of aggravating circumstances and no mitigating circumstances. Under the Florida capital felony sentencing law, the recommendation of the jury is entitled to great weight, and should not be overruled unless, based on the aggravating circumstances and the lack of mitigating circumstances, a sentence of death is clearly appropriate. Neary v. State, 384 So.2d 881 (Fla. 1980); Tedder v. State, 322 So.2d 908 (Fla. 1975).
As aggravating circumstances, the trial court judge found that at the time of the capital felony, the appellant was under sentence of imprisonment, § 921.141(5)(a), Fla. Stat. (1975), that appellant had previously been convicted of crimes involving the use or threat of violence, id. § 921.141(5)(b), that in committing the capital felony, appellant knowingly created a great risk of death to many persons, id. § 921.141(5)(c), and that the murder was especially heinous, atrocious, and cruel. Id. § 921.141(5)(h).
The finding that appellant committed the capital felony while under a sentence of imprisonment was based on the fact that he was on parole from a prison sentence at the time of the murder. Based on the evidence of this fact, we approve the court's finding of this aggravating circumstance.
The trial court judge based his finding of previous conviction of felonies involving violence of appellant's two convictions of breaking and entering with intent to commit a felony, two convictions of escape, one conviction of grand larceny, and one conviction of possession of a firearm by a convicted felon. We hold that none of these crimes falls within the meaning of this aggravating circumstance as defined by the statute. Only previous conviction of "another capital felony or of a felony involving the use or threat of violence" will satisfy section 921.141(5)(b). This subsection refers to life-threatening crimes in which the perpetrator comes in direct contact with a human victim. See Ford v. State, 374 So.2d 496 (Fla. 1979), cert. denied, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980). We therefore disapprove this finding.
The trial court judge based his finding of knowing creation of great risk of death to many persons on the fact that two women were visiting the victim at the time of the murder and appellant knew they were there. Although the evidence showed that appellant acted with total disregard for the safety of these two bystanders, this is not enough to establish this aggravating circumstance. Williams v. State, 386 So.2d 538 (Fla. 1980); Lewis v. State, 377 So.2d 640 (Fla. 1979); Kampff v. State, 371 So.2d 1007 (Fla. 1979).
The trial court judge based his finding that the murder was heinous, atrocious, and cruel on the fact that the murder was premeditated, cold and calculated, and stealthily carried out. Early in the history of the capital felony sentencing law, this Court provided an interpretation of this statutory factor. "What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crimes apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Under this standard, a murder by shooting, when it is ordinary in the sense that it is not set apart from the norm of premeditated murders, is as a matter of law not heinous, atrocious, or cruel. Lewis v. State, 377 So.2d 640 (Fla. 1979); Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977); Tedder v. State, 322 So.2d 908 (Fla. 1975). We hold, therefore, that the finding of this factor was erroneous.
The jury recommended a sentence of life imprisonment. The trial court judge's sentencing findings contain a discussion of each of the statutory mitigating circumstances and a statement that none of them are applicable to the facts of this case. *439 However, the jury is not limited, in its evaluation of the question of sentencing, to consideration of the statutory mitigating circumstances. It is allowed to draw on any considerations reasonably relevant to the question of mitigation of punishment. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Songer v. State, 365 So.2d 696 (Fla. 1978), cert. denied, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). Since three of the trial court's four aggravating circumstances have been found to be erroneous, we remand the case for reconsideration of sentence by the trial court judge so that the single established aggravating circumstance can be weighed against the recommendation of the jury.
The judgment of conviction of murder in the first degree is affirmed. The sentence of death, however, is vacated and the case remanded for a new sentencing proceeding to be held before the trial court judge.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON and ENGLAND, JJ., concur.
ADKINS, J., concurs as to conviction and dissents as to sentence.