524 So.2d 396 (1988)
Donald Robert LLOYD, Appellant,
v.
STATE of Florida, Appellee.
No. 65631.
Supreme Court of Florida.
March 17, 1988.
Rehearing Denied May 25, 1988.
Laura R. Morrison, Fort Lauderdale, for appellant.
Robert A. Butterworth, Atty. Gen., and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for appellee.
OVERTON, Justice.
Donald Robert Lloyd appeals his conviction of first-degree murder and sentence of death imposed by the trial judge in accordance with the jury recommendation. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. This murder was observed by the victim's five-year-old son, who was a critical witness at the trial. We find that the child was competent to testify and affirm the conviction, but, finding two of the three *397 aggravating circumstances improper, we conclude proportionality requires that we reduce Lloyd's sentence to life imprisonment without the possibility of parole for twenty-five years.
The following are the material facts necessary to address the issues presented. The victim, a twenty-eight-year-old woman, was murdered in her home in Tampa, Florida, on June 2, 1983. A neighbor, James Thornton, testified that he rode his bicycle to get a newspaper at approximately twelve o'clock noon on the date of the incident. He stated that on his way to get the newspaper there were no vehicles parked in a vacant lot near the victim's house. On his return a few minutes later, he noticed a Volkswagen van parked in the lot. As he was passing the van, he heard a woman's scream coming from the home of the victim. He then heard a crack-like explosive sound and thought it was a gunshot. As he turned into his driveway, he heard a second, more muffled shot. He looked toward the victim's house and saw a man running from the house. He described the man as approximately 5'8" to 5'10" tall, weighing about 180 to 200 pounds, with black bushy hair. He stated he was carrying a medium-size bag in his right hand and was trotting away from the house. Thornton testified that he got back on his bicycle and followed the man; that he saw the man approach the van and enter it; that he turned around and drove past the van, making full eye contact with the man; and that he took down the license number of the van. Thornton explained that he then went to the victim's house, knocked on the front door, and, when no one answered, he knocked harder and the door opened enough to reveal the victim's five-year-old son standing there. Thornton stated he asked the child if his mother was there and the child responded that someone had shot her and took Thornton by the hand to the bathroom where he saw the victim. Thornton immediately telephoned the police and later gave them the information about the man and the license tag of the van. Approximately fourteen hours after the incident, Thornton picked out the appellant from a photo pack as the man he saw in the van.
Another neighbor of the deceased testified that on the day of the murder, at approximately 11:40 a.m., he noticed a van proceeding down the street rather slowly at approximately five or six miles per hour toward the victim's house. He described the van as a Volkswagen microbus, red with a white top, in very good condition. He described the driver of the van as having a beard and a neatly-cropped hairstyle that was dark, sultry grey on top. He stated about twenty minutes later he saw the van returning from the direction it had come from but this time it was traveling at a speed of about thirty to thirty-five miles per hour and the same person was driving the van.
At trial, Ryan, the five-year-old son, testified that he was in the garage when a man came to the door; that he went in the house and saw who was at the door and that the man had a beard and a mustache and was wearing driving glasses; that he was a guitar player and had a suitcase and a gun; that he told Ryan and his mother to go into the bathroom; that his mother got shot twice and that prior to her being shot the man told his mother to give him money; that his mother had her wallet out and tried to give the man money and a ring. Ryan stated that after the shots the man went outside. He further stated that he went outside and saw the man go to his van, which he described as having a red top with a white bottom; that he went back inside after the man got into the van and that a neighbor arrived and called an ambulance. The evidence established that, within twenty-four hours of the incident, Ryan was shown five photographs by the police and he picked out a photograph of the appellant as the man who "hurt" his mother. Evidence was also submitted that on the first day of the trial Ryan was shown the pictures and selected a person other than the appellant out of the same group of photographs. As a result, the trial court denied the prosecution's request to allow Ryan to identify the appellant in the courtroom, but did allow the information of the original photo identification and subsequent *398 misidentification to be presented to the jury.
The medical examiner testified that during his autopsy of the victim he found two gunshot wounds, the first was a wound on the right side of the neck, and the second was a direct gunshot wound to the top of the head, which was the cause of death. He testified that this latter gunshot wound was made with the gun actually in contact with the head. The bullets found at the scene were both .38 caliber bullets. One of the bullets was a lead bullet; the other a "wad-cutter" bullet.
The investigating detective testified that a computer check of the tag number given to him by Thornton identified Lloyd, who resided in Vero Beach, as the owner of the van. In the afternoon following the shooting, officers from the Indian River County sheriff's office went to Lloyd's home and advised his wife they were looking for the appellant. When the appellant later called home, his wife told him about the contact with the police and Lloyd advised her to meet him at the sheriff's office. Lloyd and his wife met at the sheriff's office and waited for Tampa detectives to arrive. When the Tampa detectives arrived, they obtained basic information from him, such as his name, height, weight, address, prior record, and occupation prior to reading him his rights. He was then read his Miranda[*] rights and questioned concerning his whereabouts on June 2, the day of the killing. The appellant told the detectives that he was in Tampa looking for work and he inquired of them as to why they were interrogating him. He was advised that their investigation involved the homicide of a twenty-eight-year-old woman who was shot and killed and that his vehicle was positively identified at the scene and a person fitting his description had been seen running from the victim's home. At that point the appellant stated, "Okay, you've got me; I've got nothing else to say. Why don't you go ahead and shoot me and get it over with now?" The interrogation ceased at that point. The Tampa officers then departed, after taking photographs of the appellant.
Two deputies stated that while Lloyd was in the waiting room of the Indian River sheriff's department, he volunteered the statement, "If I had known this about a contract killing, I would have been on my way to Mexico by now," and "Somebody got my tag number. There was a witness. Hey, they got me. I don't have anything against you guys. I know you've got a job to do." The deputies also testified that they overheard Lloyd tell his wife to sell everything and forget about him, that he was no good.
A deputy sheriff for the Indian River County sheriff's department testified that he had given the defendant .38 caliber ammunition within the last two years, and that they were wadcutters. The appellant did not testify in his own behalf.
The jury found Lloyd guilty of first-degree murder.
During the penalty phase, appellant presented testimony from his wife, his nine-year-old daughter, and other family members that he was a good husband and father, and from an employer that he was a good, dependable worker. At the conclusion of the penalty phase, the jury, by a seven-to-five vote, recommended that Lloyd be sentenced to death. The trial judge, in imposing the death sentence, found three aggravating circumstances: (1) that the offense was committed while the appellant was engaged or was an accomplice in the commission of or an attempt to commit any robbery, rape, arson, burglary, or kidnapping; (2) that the felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (3) that the crime was especially heinous, atrocious, and cruel. The trial judge also found one mitigating circumstance, that the appellant had no significant history of prior criminal activity. The court concluded that "insufficient mitigating circumstances exist[ed] to outweigh the aggravating circumstances."

*399 GUILT PHASE
With regard to the guilt phase of the trial, the appellant raises six asserted claims of trial court error. He contends the trial court erred (1) by denying appellant's expert psychologist sufficient time to evaluate the victim's child before he allowed him to testify at trial; (2) in ruling the child was a competent witness; (3) in denying appellant's motion to suppress the pretrial photographic identification of the appellant by the child; (4) in admitting testimony as to the child's out-of-court identification of the appellant; (5) in failing to suppress the appellant's statements; and (6) in allowing the witness Jack Williamson to testify.

COMPETENCY OF A FIVE-YEAR-OLD TO TESTIFY
The first two contentions concern the evaluation of five-year-old Ryan to testify and the finding of the trial court that Ryan was competent to testify. At the outset it is appropriate to set forth the following chronology of events concerning these competency issues: June 2, 1983, the victim was killed; February 10, 1984, a defense motion to employ an independent expert to evaluate Ryan and testify at the child's competency hearing was granted; February 20, 1984, the defense expert prepared and filed a report from all records and depositions given him by defense counsel; February 22, 1984, the court held a hearing to determine Ryan's competency to testify at the trial. The judge, prosecutor, and defense attorney all questioned the child. The defense expert also testified at this proceeding. The court found Ryan understood the duty to tell the truth and found his testimony to be a matter of credibility for the jury. On May 7, 1984, the state's expert conducted an additional evaluation of Ryan, giving him the following six psychological tests: a Stanford-Binet  LM; a Peabody Picture Vocabulary Test  Revised Form L; a Performance Scale of the WISC-R; a Draw-A-Person Test; a Child's Sentence Completion Test; and a Three-Wishes Test. On May 15, 1984, the defense expert received the raw data from these tests. On May 17, 1984, the trial court granted the defense expert one hour to examine the child, justifying the limitation on the basis that the state's expert took only one hour for his examination, excluding the time necessary to give the above tests.
Appellant, in his first point, asserts his expert was improperly limited in the amount of time he was able to spend with the child. He argues a one-hour time period was arbitrary and an unrealistic time limitation, depriving his expert of an opportunity to conduct an appropriate professional evaluation of the child.
Appellant argues there was never any showing that interviews or evaluation by the defense would be more potentially harmful to Ryan than the interviews by the representatives of the state. Appellant contends that, even assuming the state expert had seen Ryan for only one hour, the trial court's refusal to allow the defense expert to examine the child for a longer period of time created a fundamental denial of appellant's due process rights. We reject this contention. The record reflects that the court granted the defense request to pay for an expert and allow him to conduct his own examination in order to afford the defense an opportunity to challenge the child's competency to testify. Although the trial court limited the examination of Ryan to one hour, the judge noted that if the expert found anything to indicate there were problems with the child, he would reconsider. All the records of the child's previous examinations were made available to the defense expert, including the tests administered by the state expert. We find no due process violation. There is no showing that the defense expert believed other tests were necessary, and his conclusions did not indicate any abnormality or need for further examination.
The second point concerns the asserted trial court error in allowing Ryan to testify at trial. At common law, a person under fourteen years of age was not considered a competent witness in any controverted matter. Radiant Oil Co. v. Herring, 146 Fla. 154, 200 So. 376 (1941). That *400 rule has been abandoned in this state, and the prime test of testimonial competence of an infant witness is his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth. Bell v. State, 93 So.2d 575 (Fla. 1957). The test has been reiterated in multiple district court of appeal decisions. Garrard v. State, 335 So.2d 603 (Fla.3d DCA 1976), cert. denied, 342 So.2d 1101 (Fla. 1977); Fernandez v. State, 328 So.2d 508 (Fla. 3d DCA), cert. denied, 341 So.2d 1081 (Fla. 1976); McKinnies v. State, 315 So.2d 211 (Fla. 1st DCA 1975); Harrold v. Schluep, 264 So.2d 431 (Fla. 4th DCA 1972). It is the established law of this state that if an infant witness has sufficient intelligence to receive a just impression of the facts about which he or she is to testify and has sufficient capacity to relate them correctly, and appreciates the need to tell the truth, the infant should be permitted to testify. Williams v. State, 400 So.2d 471 (Fla. 5th DCA), affirmed 406 So.2d 1115 (Fla. 1981). It is within the discretion of the trial judge to decide whether an infant of tender years has sufficient mental capacity and sense of moral obligation to be competent as a witness. Except when there is an abuse of that discretion, the trial court's decision will not be disturbed. See Rutledge v. State, 374 So.2d 975 (Fla. 1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980).
The trial judge in the instant case personally examined Ryan, in addition to hearing testimony and receiving reports from the experts regarding Ryan's ability to testify. The state expert expressed the view that the child possessed suitable capabilities to be allowed to testify. The defense expert testified that Ryan appeared to be an average five-and-one-half to six-year-old child, who showed signs of suffering from mild depression, and that he responded to questions as a five-year-old generally does. The defense expert stated, however, that in his view Ryan was not capable of recalling events and testifying accurately about events which occurred six to nine months ago, and that an average six-year-old child is not able to understand the impact of telling the truth in a courtroom proceeding, nor to appropriately understand his role in such a proceeding. He stated that in his opinion, which he believed was supported by scientific studies, a mental age of at least seven years old is required to understand and participate knowingly and understandably in a judicial oath. Further, he believed no child under six years of age is able to clearly and unequivocally separate fantasy from reality, and, in his view, there would be an intermixing of fact and fantasy in Ryan's testimony. He was of the opinion that Ryan's testimony was somewhat affected by fantasy, but he could not say to what degree. The appellant also contends that there are multiple inconsistencies in the stories told by Ryan since his mother was killed, and these inconsistencies render his testimony unreliable.
We find that the trial judge was thorough and careful in his evaluation of Ryan, and clearly recognized the importance of the child's testimony in this proceeding. His determination was proper and he did not abuse his judicial discretion in allowing Ryan to testify. We note that most of the critical facts supplied by Ryan's testimony are either unrefuted or corroborated; particularly, that the man who entered the house and shot his mother was unknown to him, and that the man who shot his mother left the house and entered a van which was red and white in color. The record reflects that the trial judge heard testimony from experts regarding Ryan's ability to testify. He personally examined Ryan extensively. He found Ryan sufficiently intelligent to be capable of expressing himself concerning this matter and also found that Ryan understood his duty to tell the truth. We find the inconsistencies in Ryan's various statements were not so egregious as to require a total rejection of his testimony. The inconsistencies were nothing more than what you would expect from a five- or six-year-old child and, in our view, did not affect the material portions of his testimony. We further find that everything done with the child in this instance was to assure an accurate reporting of his observations and impressions. The critical facts in this *401 case are not totally dependent on the child's observations. The neighbor, Thornton, not only heard the shots and saw the man run from the direction of the house, but he intentionally put himself in a position where he could observe the man, took the tag number of the man's vehicle, and a day later positively identified the appellant as the man he had seen. We find no abuse of discretion in allowing Ryan to testify in this case.

ADMISSION OF RYAN'S PRETRIAL IDENTIFICATION OF APPELLANT
The trial court permitted the state to present testimony of one of the detectives that Ryan had selected appellant's picture from a five-picture photo pack as the man who hurt his mother. This selection by the child occurred approximately twenty-four hours after the incident. Present were the child's grandmother and two detectives. Upon a review of these photographs at the time of the motion to suppress, the trial judge noted:
I think it was a very fair photo lineup. There can be no question about that. I think as a matter of fact, one guy in there looked like his twin brother. It's amazing he made the right identification so there is nothing unfair by any stretch of the imagination regarding the photo lineup or the way they were set out. There is nothing suggestive about that.
At another point, "It's amazing to get five people so similar."
On the first day of trial, the trial judge directed that Ryan be shown again the same photographic lineup in chambers. This occurred approximately eleven months after the incident. On this occasion, the child selected someone other than the appellant. As a result of this failure to identify appellant, the court prohibited the state from attempting to have Ryan identify the appellant in the courtroom, but allowed the state to adduce testimony that at the earlier time Ryan had picked out the appellant as the man who shot his mother. The state was also required to advise the jury that, in the recent photographic lineup in chambers, the child had picked out someone other than the appellant as his mother's assailant. We find no harmful error in allowing the admission of this evidence. The prior identification and subsequent misidentification were matters that could properly be considered by the jury as a matter of credibility, since the witness was before the court for examination. See, e.g., Chaney v. State, 267 So.2d 65 (Fla. 1972); Brown v. State, 397 So.2d 320 (Fla.2d DCA 1981); Daniels v. State, 262 So.2d 725 (Fla. 3d DCA 1972).

REMAINING ISSUES IN THE GUILT PHASE
We find the statements the appellant made at the Indian River County sheriff's office were properly admitted. The statements were made after he had been warned of his Miranda rights and were statements that he initiated and were not the result of any inquiry. We also reject appellant's contention that the court improperly admitted testimony that three months before this incident he was carrying a .32 or a .38 revolver in his shaving kit. Finally, we conclude that a review of the entire record clearly establishes sufficient evidence to sustain this conviction.

PENALTY PHASE
In the penalty phase of the trial, the appellant argues that none of the following three aggravating circumstances were established beyond a reasonable doubt: (1) that the crime was committed while the defendant was engaged in the crime of attempted robbery; (2) that the crime was especially wicked, atrocious, or cruel; and (3) that the crime was committed in a cold, calculated, and premeditated manner without pretense of legal or moral justification. With regard to the mitigating circumstances, Lloyd asserts that the record establishes that he had no significant history of prior criminal activities; that he was only an accomplice in the offense for which he was sentenced, the murder having been committed by another person; that his participation was relatively minor; and that he was a good husband, father, and employee. The trial court found only that Lloyd had *402 no significant history of prior criminal activities.
Appellant argues that the trial court incorrectly found the merged aggravating circumstances of robbery and pecuniary gain in this case. He asserts that during the charge conference the trial court determined there was no proof that the offense was committed for pecuniary gain and, consequently, there was insufficient evidence that the murder was committed during the commission of a robbery, and, therefore, the first aggravating circumstance must fail. The state responds that, subsequent to the charge conference, the trial court expressly found the testimony of Ryan established the commission or attempted commission of a robbery, and that, even if the trial court had found no evidence of pecuniary gain, this Court should reweigh the evidence in the case and find the aggravating circumstances are supported by the record, and properly merged under the dictates of Provence v. State, 337 So.2d 783, 786 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).
The trial court, in its sentencing order assessing the applicability of this statutory aggravating circumstance, stated:
D. THE CAPITAL FELONY WAS COMMITTED WHILE THE DEFENDANT WAS ENGAGED, OR WAS AN ACCOMPLICE, IN THE COMMISSION OF, OR AN ATTEMPT TO COMMIT, OR FLIGHT AFTER COMMITTING OR ATTEMPTING TO COMMIT, ANY ROBBERY, RAPE, ARSON, BURGLARY, KIDNAPPING, OR AIRCRAFT PIRACY OR THE UNLAWFUL THROWING, PLACING OR DISCHARGE OF A DESTRUCTIVE DEVICE OR BOMB. FACT:
1. The defendant gained entrance to the home of Cheryl Osborne, victim.
2. Defendant asked for money as evidenced by testimony of Ryan Osborne who was an eye-witness to the transaction. This was confirmed by the victim's wallet being found open on the [lavatory] cabinet in the bathroom where the request for money had been made by the defendant at gun point.
CONCLUSION: The evidence illustrates beyond and to the exclusion of a reasonable doubt that the capital felony was committed while the defendant was engaged in an attempt to commit a robbery.
... .
F. THE CAPITAL FELONY WAS COMMITTED FOR PECUNIARY GAIN. FACT:
1. The defendant gained entrance to the home of Cheryl Osborne, victim.
2. Defendant asked for money as evidenced by the testimony of Ryan Osborne who was an eye-witness to the transaction. This was confirmed by the victim's wallet being found open on the [lavatory] cabinet in the bathroom where the request for money had been made by the defendant at gun point.
CONCLUSION: This aggravating circumstance merges with aggravating circumstance D.
We find the record supports the conclusion of the trial court at the charge conference that there was sufficient evidence to support an attempted robbery instruction. The fact that nothing was taken by the assailant from the premises is not critical to the offense of attempted robbery.
Appellant next argues that nothing in the instant offense sets it apart from other first-degree murders and aggravates the crime statutorily to the heinous, atrocious, and cruel classification. He argues that this murder was not unnecessarily torturous to the victim. We agree this aggravating circumstance has not been established. Clearly, the circumstances of this murder do not resemble the facts of those cases in which this Court has upheld application of the heinous, atrocious, and cruel aggravating circumstance. See, e.g., Jennings v. State, 512 So.2d 169 (Fla. 1987); Koon v. State, 513 So.2d 1253 (Fla. 1987); Kight v. State, 512 So.2d 922 (Fla. 1987); Wilson v. State, 493 So.2d 1019 (Fla. 1986).
On facts similar to these, this Court has previously rejected application of the heinous, atrocious, and cruel aggravating circumstance. In Menendez v. State, 368 So.2d 1278 (Fla. 1979), we found that the death *403 of a jewelry store owner from two shots would not rise to the shocking level required by this factor, despite allegations by the prosecution that the position of the jeweler's arms indicated submission at the time of the shooting. In Lewis v. State, 398 So.2d 432 (Fla. 1981), where the victim was fired upon from outside his bedroom window, and died instantly of multiple shotgun and rifle wounds, we rejected application of this circumstance. As we stated, "A murder by shooting, when it is ordinary in the sense that it is not set apart from the norm of premeditated murders, is as a matter of law not henious, atrocious, or cruel." Id. at 438. Similarly, in Oats v. State, 446 So.2d 90 (Fla. 1984), we found the trial judge erred in applying the aggravating circumstance where the facts revealed only that the victim was killed by a direct shot to the head, and the state failed to introduce any other evidence to prove this circumstance.
We find nothing in the record which would demonstrate that this murder was "extremely wicked or shockingly evil," or "designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering" of this victim. State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Here, the victim was shot twice and died. There is nothing in the facts which sets this murder "apart from the norm of capital felonies." Id. at 9.
With regard to the third aggravating circumstance, the appellant contends that, although there was sufficient evidence of premeditation, there was an insufficient showing of the heightened premeditation, calculation, or planning that must be established to support a finding that the murder was cold, calculated, and premeditated. In view of our recent decision in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), we agree this aggravating circumstance has not been established because there is insufficient evidence of a calculated plan or prearranged design. No motive for this offense was established in this record, and, although the evidence might create a suspicion that this was a contract killing, that fact was not established beyond a reasonable doubt.
Having found that two aggravating circumstances are not supported by the record, this death sentence is now supported by just one aggravating circumstance  that the murder was committed during the course of an attempted robbery  and one mitigating circumstance  that the appellant had no significant history of prior criminal activities. A review of our prior decisions requires us to conclude that the imposition of the death penalty on this record is proportionately incorrect, and, consequently, the death penalty must be vacated and a life sentence imposed. See Rembert v. State, 445 So.2d 337 (Fla. 1984); see also Proffitt v. State, 510 So.2d 896 (Fla. 1987); Swan v. State, 322 So.2d 485 (Fla. 1975).
Accordingly, we affirm the conviction but vacate Lloyd's death sentence and reduce his sentence to life imprisonment without eligibility for parole for twenty-five years.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[*] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).