657 So.2d 1138 (1995)
Kevin SINCLAIR, Appellant,
v.
STATE of Florida, Appellee.
No. 82499.
Supreme Court of Florida.
June 22, 1995.
*1139 James B. Gibson, Public Defender and George D.E. Burden, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Carol M. Dittmar, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Kevin Sinclair. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction but vacate the sentence of death.
On January 20, 1993, at approximately 1:00 p.m., Kristine Pellizze was awakened by a loud bang at her home on Wakefield Street in Palm Bay. The noise was from a taxicab smashing into her garage door. Upon further investigation, she observed a man slumped over in the driver's seat with his head hanging out the car window. Pellizze then called 911. The paramedics arrived on the scene and noticed that the man in the cab had a hole on the right side of his head and suspected that he had been shot. A search for the weapon was unsuccessful.
The cab company was contacted, and it was determined that the victim had picked up a passenger on Gibbs Street in Melbourne shortly before being shot. Further investigation revealed Sinclair as a potential suspect. Detective Bauman called Sinclair's home at approximately 11:30 p.m. for an interview. Shortly after midnight, two detectives arrived at Sinclair's home and conducted an audio-taped interview. During the interview, Sinclair gave Detective Bauman the clothing that he had worn that day. On his yellow shorts was a reddish-brown splattering consistent with blood. Sinclair explained that while he was walking home, he fell and soiled his shorts. The detectives left Sinclair's home, stating that they might have to contact him again.
The following morning, Detective Bauman returned to Sinclair's home and asked him if he was available to come to the police station for further questioning. Sinclair agreed. At the police station, Detective Bauman advised Sinclair of his constitutional rights and then conducted a video-taped interrogation. During the interrogation, Sinclair admitted that he accidentally shot the victim. The detectives subsequently obtained permission to search Sinclair's room and recovered five .22 caliber spent casings and two .22 caliber full bullets.
Sinclair was indicted for first-degree murder from a premeditated design. At trial, Sinclair testified that he summoned a cab to take him to his mother's home. He further testified that he never intended to pay the cab fare and was going to run from the cab. Sinclair admitted that he carried a loaded .22 caliber handgun in his pocket as he entered the cab. He stated that he pulled the gun out of his pocket to scare the victim as Sinclair left the cab. Sinclair also admitted that the gun was discharged in the cab and that the cab driver was shot in the head. Although Sinclair stated that the gun fired only one time, the medical examiner testified that there were two separate and distinct gunshot wounds to the right side of the victim's head. Sinclair denied taking any money from the cabdriver. Testimony showed that the victim collected $61 plus tips that day. A thorough search of the victim's person, the scene, and the cab was conducted, but the money was never found.
It was further determined that for some time prior to the date of the murder, Sinclair and his friends devised a scheme to defraud Sinclair's mother out of her money. It was established that Sinclair forged the signature of his mother on numerous bank withdrawal request forms and removed $4,000 from her bank account. On the day of the murder, Sinclair and his mother were scheduled to appear at the bank to discuss the unauthorized withdrawals of money.
On the eve of the murder, Sinclair openly discussed his plans to commit robberies in order to gain money. In particular, he told one friend that he planned to rob a cabdriver.
The jury returned a verdict of guilty on the charge of first-degree murder and recommended death by a vote of eleven to one. *1140 The trial judge, finding one aggravator[1] and no statutory mitigators, and giving little to no weight to three of the nonstatutory mitigators,[2] sentenced Sinclair to death. On appeal, Sinclair raises seven issues, only three of which need to be discussed.[3]

GUILT PHASE
As his first claim, Sinclair asserts that during the guilt phase of the trial, the court erred in allowing witness Evette Busby to testify over objection to admissions against interest by Sinclair. Florida Rule of Criminal Procedure 3.220(b)(1)[4] requires the prosecutor to disclose the statement of any person whose name is furnished to the defense through discovery. Sinclair contends that the trial court committed reversible error when it ruled that such a statement was admissible without prior disclosure and without conducting an adequate Richardson hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla. 1971). The State argues that the trial court properly conducted a Richardson hearing and determined that no discovery violation had occurred. Further, the State claims that the judge found that the State had no knowledge of Busby's statement prior to Busby's testifying in court, and thus there was no need to determine whether Sinclair was prejudiced from the State's failure to disclose the statement.
Under Richardson, when the State violates a discovery rule, the trial court has discretion to determine whether the violation resulted in harm or prejudice to the defendant, but this discretion can be properly exercised only after adequate inquiry into all the surrounding circumstances. State v. Hall, 509 So.2d 1093 (Fla. 1987). In making such an inquiry, the trial judge must first determine whether a discovery violation occurred. If a violation is found, the court must assess whether the State's discovery violation was inadvertent or willful, whether the violation was trivial or substantial, and most importantly, what affect it had on the defendant's ability to prepare for trial. Id.
In the present case, the defense attorney, after he objected to the testimony offered by witness Evette Busby, specifically requested a Richardson hearing. The defense contended that though Sinclair was aware that Ms. Busby would testify that Sinclair had discussed robbing people, robbing stores, or stealing cars and selling parts to raise money, the witness denied ever saying that Sinclair *1141 stated he was going to rob a cabdriver. When the defense made the request, the judge excused the jury, stated that he was convening a Richardson hearing, and inquired of counsel as to the discovery status of statements made by the witness to the State. The court then inquired of the assistant state attorney:
THE COURT: ... .
Did this witness advise you prior to trial, prior to your response to discovery, that the Defendant told her specifically that he was going to rob a cab or is that something that has just surfaced here today?
The assistant state attorney then responded:
MR. BAUSCH: Judge, I feel that if the specific information about robbing a cab would have been told to me that I would have put that in the discovery. I do know that Ms. Busby told me that he was discussing different types of robberies, and she specifically mentioned robbing stores, such as 7-11's or that kind of thing. And I do specifically remember that she told me that he was talking about stealing cars and then selling the parts of those cars to make money.
The court then inquired as to whether the defense had deposed the witness. Defense counsel responded that he had been unable to arrange a deposition but that he had recently spoken with the witness. The court then inquired of the witness:
BY THE COURT:
Q. Now, ma'am, let me ask you, when Mr. Bausch asked you the question here today about what you overheard the Defendant say, and you responded here today that you overheard the Defendant say he was going to rob a cab; is that right?
A. [Ms. Busby] Thinking about it, yes.
Q. Is it something you're thinking about now, that you just recall now?
A. From my understanding I thought I told him on the telephone that.
Q. You thought you told him that?
A. Uh-huh. Both of them. I was talking very honest to both people.
After discussing the issue further with counsel, the court determined that there was no basis to conclude that there had been a willful discovery violation.
Our review of the trial court proceedings causes us to conclude that a proper Richardson hearing was held. Sinclair contends that our decision in State v. Hall, 509 So.2d 1093 (Fla. 1987), supports his argument that the hearing held by the trial judge was not an "adequate" Richardson hearing. We do not agree. To the contrary, as in Hall, we find the record here shows, when viewed as a whole, that the trial court made an adequate inquiry and concluded that there was no basis to find a willful discovery violation by the State. We agree with the trial court that none of the rules of criminal procedure relating to discovery require the State to disclose information which is not within the State's actual or constructive possession. Fla.R.Crim.P. 3.220(b)(1). We therefore reject Sinclair's claim and affirm the trial court's decision on this issue.
As his second issue, Sinclair claims that the trial court erred in denying his motion for a continuance of trial based on the fact that his trial counsel announced her resignation from the public defender's office the month before the trial was set to begin. The trial in this case was originally continued for several months, and the judge expressly granted an extended continuance in order to ensure that the case could be tried on the August 16, 1993 date. Further, Mr. Reynolds, the lead defense attorney in the case, had been representing Sinclair from the time the public defender's office was initially appointed. The time to be given a defendant to obtain counsel and prepare for his defense is within the discretion of the trial court, "controlled by what is fair, right, and reasonable in each particular case." Brown v. State, 116 Fla. 587, 588, 156 So. 606 (1934). Our independent review of the record reveals no abuse of discretion on the part of the trial court as to this claim. Gore v. State, 599 So.2d 978 (Fla.), cert. denied, ___ U.S. ___, 113 S.Ct. 610, 121 L.Ed.2d 545 (1992).
Based on the foregoing, we affirm Sinclair's conviction of first-degree murder and move on to the claims raised regarding the sentencing phase of the proceedings.

*1142 SENTENCING PHASE
Sinclair raises several points concerning his death sentence, only one of which we need discuss, as it is dispositive. In a detailed and well-written sentencing order, the trial judge, after weighing the one aggravator against the three nonstatutory mitigators, found that the mitigators were insufficient to counterbalance the aggravating factor which was proven beyond a reasonable doubt. The judge therefore found the sentence of death to be proportionate.
We conclude that the death sentence must be reversed in this case because the imposition of such a sentence would not be proportionate. In Tillman v. State, 591 So.2d 167 (Fla. 1991), we discussed "proportionality review":
We have described the "proportionality review" conducted by this Court in every death case as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990) (citation omitted) (emphasis added), cert. denied, [498] U.S. [1110], 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Accord Hudson [v. State], 538 So.2d 829 at 831 [Fla. 1989]; Menendez v. State, 419 So.2d 312, 315 (Fla. 1982). The requirement that death be administered proportionately has a variety of sources in Florida law, including the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, Fla. Const. It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper. Id. Moreover, proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. Art. I, § 9, Fla. Const.; Porter.

Proportionality review also arises in part by necessary implication from the mandatory, exclusive jurisdiction this Court has over death appeals. Art. V, § 3(b)(1), Fla. Const. The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction. See id. Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death penalty law.
Id. at 169 (footnote omitted).
In Thompson v. State, 647 So.2d 824 (Fla. 1994), as in the instant case, we reviewed a case in which the only valid aggravator was that the murder was committed in the course of a robbery. Though here the mitigators are not as significant as those found in Thompson, there are mitigators which were found to have some weight by the trial court. These were: (1) Sinclair cooperated with police; (2) Sinclair has a dull normal intelligence; and (3) Sinclair was raised without a father or father figure or any positive male role model. We further find evidence in the record that the low intelligence level of and the emotional disturbances inflicting this defendant were mitigators which had substantial weight.
In Thompson we remanded for the imposition of a life sentence. In light of Thompson and our consideration of Clark v. State, 609 So.2d 513 (Fla. 1992), McKinney v. State, 579 So.2d 80 (Fla. 1991), Lloyd v. State, 524 So.2d 396 (Fla. 1988), Proffitt v. State, 510 So.2d 896 (Fla. 1987), Caruthers v. State, 465 So.2d 496 (Fla. 1985), and Rembert v. State, 445 So.2d 337 (Fla. 1984), we agree with Sinclair that death is a disproportionate sentence.
We have considered the State's contention that Hayes v. State, 581 So.2d 121 (Fla.), cert. denied, 502 U.S. 972, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991), supports the death sentence. However, in that case, there was evidence to support two valid aggravators, i.e., merging as one circumstance the aggravating circumstances of murder committed for pecuniary gain and murder committed *1143 while engaged in an armed robbery, and the murder was cold, calculated, and premeditated. We also find Smith v. State, 641 So.2d 1319 (Fla. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1129, 130 L.Ed.2d 1091 (1995), and Eutzy v. State, 458 So.2d 755 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985), to be distinguishable.
We therefore affirm Sinclair's conviction of first-degree murder, and vacate the death penalty and reduce it to life in prison without possibility of parole for twenty-five years. See section 775.082(1), Florida Statutes (1989).
It is so ordered.
GRIMES, C.J., and OVERTON, KOGAN and HARDING, JJ., concur.
SHAW and ANSTEAD, JJ., concur in result only.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Justice, concurring in part and dissenting in part.
I concur with the affirmance of the conviction in this case. I dissent in respect to the setting aside of the death penalty. I stated my opinion in Thompson v. State, 647 So.2d 824 (Fla. 1994), that the majority ignored the legislative intent of our capital punishment statute in that case involving the murder of a sandwich shop employee. Likewise, I do not agree that this Court should set aside the application of the death penalty statute in this case involving the murder of a cab driver.
NOTES
[1] The trial court merged as one circumstance the aggravating circumstances of murder committed for pecuniary gain and murder committed while engaged in the commission of a robbery. § 921.141(5)(d), (f), Fla. Stat. (1991).
[2] The trial judge gave little to no weight to the following nonstatutory mitigators: (1) Sinclair cooperated with police; (2) Sinclair has a dull normal intelligence level; and (3) Sinclair was raised without a father or father figure, or any positive male role model.
[3] We do not find error in the remaining four issues: (1) that the trial court erred in giving little weight to age as a mitigating factor, see Ellis v. State, 622 So.2d 991 (Fla. 1993); Deaton v. State, 480 So.2d 1279 (Fla. 1985); Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981); (2) that the trial court erred in rejecting the mitigating factor of no significant history of criminal activity, see Johnson v. State, 608 So.2d 4 (Fla. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2366, 124 L.Ed.2d 273 (1993); (3) that the trial court erred in denying defendant's motions to suppress, see Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988) (objection raised at appellate level as to evidence procedurally barred because no objection was made at the time the evidence was introduced); and (4) that section 921.141, Florida Statutes (1991), is unconstitutional.
[4] Rule 3.220(b)(1), states in pertinent part:

(b) Prosecutor's Discovery Obligation.
(1) After the filing of the charging document, within 15 days after service of the defendant's notice of election to participate in discovery, the prosecutor shall disclose to defense counsel and permit counsel to inspect, copy, test, and photograph the following information and material within the state's possession or control:
... .
(B) the statement of any person whose name is furnished in compliance with the preceding subdivision. The term "statement" as used herein includes a written statement made by the person and signed or otherwise adopted or approved by the person and also includes any statement of any kind or manner made by the person and written or recorded or summarized in any writing or recording. The term "statement" is specifically intended to include all police and investigative reports of any kind prepared for or in connection with the case, but shall not include the notes from which those reports are compiled; ... .