374 So.2d 975 (1979)
Jesse Raymond RUTLEDGE, Appellant,
v.
STATE of Florida, Appellee.
No. 48801.
Supreme Court of Florida.
July 26, 1979.
Rehearing Denied October 4, 1979.
*976 Peter F. Laird, Gainesville, for appellant.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, Florida, for appellee.
PER CURIAM.
We have for review by direct appeal Jesse Raymond Rutledge's convictions of two counts of murder in the first-degree and sentences of death and two counts of assault with intent to commit murder. Jurisdiction vests in this Court pursuant to article V, section 3(b)(1).
Rutledge was charged in a four count indictment returned June 9, 1975, with the murder in the first-degree of Anna Williams by cutting and stabbing her with a sharp instrument, murder in the first-degree of Wiley Williams by cutting and stabbing, assault with intent to commit murder upon Harold Williams, and assault with intent to commit murder upon Andrew Williams. He was found guilty by the jury on all counts. After sentence hearing, a majority of the jury recommended that the death penalty be imposed. The trial judge agreed and imposed two consecutive death sentences for the murder convictions and two consecutive fifteen year sentences for the assault to commit murder convictions. While incarcerated on the murder charge, appellant pled guilty to an unrelated crime with which he had been charged prior to the date of the murders and was sentenced on March 17, 1975, to serve a term of five years. On April 7th, he was delivered to custody of the Division of Corrections.
Completely supported by the record, the trial judge, in his sentencing order, gave an excellent detailed analysis of the factual setting of these murders as follows:
The trial commenced in Alachua County, Florida, October 27, 1975. The tragedy of the Williams' family as reflected in the trial of the case revealed that WILEY WILLIAMS, SR., was married to ANNA LOUISE WILLIAMS, age 27, and lived in the quiet community of Hawthorne, Florida. There were three children of the marriage: WILEY WILLIAMS, JR., age 10; HAROLD WILLIAMS, age 9; and ANDREW WILLIAMS, age 7. The family had lived in their home which became the scene of this tragedy for nine years. Mr. Williams, the husband and father, worked *977 two jobs. His hours on the first job were from 8:30 a.m. to 5:00 p.m. His second job was at Shands Teaching Hospital in Gainesville, Alachua County, Florida, with hours from 6:00 p.m. to 2:00 a.m. On the eve of November 24, 1975 [sic], he left his home for work, leaving behind his wife and three children. Everything was normal when he left home, and according to his usual custom the wife and children were all in the house and the doors locked.
A neighbor, Mr. Boyer, testified that on the evening of November 24, 1975 [sic], he watched a television program and some news and went to his bedroom. This neighbor lived about 100 feet away from the Williams' house. After being in his bedroom for some time he heard children screaming which according to his testimony was "back around the Williams' house." He looked out and saw lights on in the house and the front door open. The screaming continued. The oldest boy whom he recognized as WILEY WILLIAMS, JR., ran out the front door hollering and screaming being chased by a larger boy whom he did not recognize. The larger boy drug the Williams' boy back into the house. He continued to hear screaming from the Williams' home, but for whatever reason he did not investigate to determine the cause.
A telephone operator for Southern Bell Telephone Company testified she was on duty and working the switchboard on the night of November 24, 1974; and about ten or fifteen minutes after midnight the Hawthorne switch on her telephone panel lit up. When she plugged in to receive the call she heard screaming and a voice say "please don't, I won't tell anyone." She further testified she could hear children screaming in the background but was unable to get a response from the caller. She instinctively and immediately relayed the call to the Alachua County Sheriff's Office emergency number. However, she continued to keep her key open and listened to the screaming and crying. Mrs. Hoard, the supervisor of communications for the Alachua County Sheriff's Department, testified she was on duty on the night of November 24, 1974, when the call was relayed to the Sheriff's Office at approximately 12:20 a.m. Another operator had taken the call but asked her to plug in, which she did, whereupon she heard screaming in the background. From the moment the call was relayed from the telephone company to the Sheriff's Office the call was taped. Attempts were made to have the call traced so the exact location of the screaming could be determined. Unfortunately the attempts were unsuccessful. The tape continued to run and record the violent screaming, pleading and crying coming from Hawthorne until there was total silence on the phone.
WILEY WILLIAMS, SR., got off work at approximately 2:05 a.m. on the morning of November 25, 1974, and arrived back at his home in Hawthorne approximately 2:35 a.m. He noticed lights on in the house and the front door open. As he went into the house he saw first his youngest son, ANDREW, bloody. He looked into his and his wife's bedroom and saw her lying on the bed in a mass of bloody sheets and pillowcases with the telephone off the receiver lying at her side. After a frantic search he located the other two boys who were bloody and cut up.
Having determined that his wife, ANNA, and his oldest son, WILEY JUNIOR, were dead, Mr. Williams, without disturbing anything, ran to a neighbors [sic] house and had the Sheriff's Department summoned. Lieutenant Hansen, the shift commander for the Alachua County Sheriff's Department, arrived at the Williams' home followed by two other deputies from that office. As he entered the front door he saw blood on the floor. He observed Mrs. Williams on the bed with a sheet across her from her waist down, her nightgown pulled up around her neck and the telephone off the hook lying beside her bloody body. He located WILEY WILLIAMS, JR., dead in the *978 bunkbed in his bedroom. He located the two younger children in the house cut and bleeding but still alive. The scene was secured by the crime scene investigator, and criminal investigation commenced immediately. Blood was observed on the ground from the front door out to the fence some 33 feet away, apparently left there by WILEY WILLIAMS, JR., as his assailant chased him out of the house and dragged him back inside. The scene of the crime was described by several of the investigating officers as a bloody scene.
HAROLD WILLIAMS and ANDREW WILLIAMS were given first aid at the scene and taken to Alachua General Hospital for treatment. HAROLD WILLIAMS was seen at Alachua General Hospital by Doctor Summerlin at about 4:30 a.m. who described his condition as critical. His body had 32 stab wounds from top to bottom. He had suffered acute blood loss, one of the stab wounds being in the heart and one penetrating the stomach, liver and diaphram [sic]. Open-chest surgery was required for repair of the three-quarter-inch wound in the right ventricle of his heart. The wounds to his stomach were repaired. In the course of the medical procedures he suffered cardiac arrest requiring heart massage to restore the heartbeat.
Notwithstanding the injuries suffered by him, HAROLD WILLIAMS survived the many weeks of post-operative complications which included even more surgery to identify his assailant to officers in the hospital, and subsequently in the course of the trial identified the Defendant, JESSE RAYMOND RUTLEDGE, as being his assailant and the man in his house the evening of the vicious attack upon him, his two brothers and his mother.
The youngest son, ANDREW WILLIAMS, had two stab wounds in his chest, one of which caused a collapsed lung. He had several lacerations on his face, lacerations on his left thigh, lacerations on the left knee and a laceration of the right side of his chest. Andy also survived and testified at the trial that he was in the bed with his mother and saw her stabbed. The man wore a mask, and he did not see his face. However, his brother HAROLD testified that as the Defendant left his bedroom through a window he saw the Defendant remove the mask and had a closeup view of his face. All the Williams' children knew the Defendant, JESSE RAYMOND RUTLEDGE, from school.
Doctor Klein, pathologist and medical examiner for District III, performed the autopsy on ANNA LOUISE WILLIAMS and WILEY WILLIAMS, JR. The body of WILEY WILLIAMS, JR., contained two wounds, one on the left side of his chest which passed through his heart and into his liver and one in his abdomen near the belly button. He testified that the wounds were the sole cause of the death of WILEY WILLIAMS, JR., and that he had bled to death from the heart wound. The wounds on the body of ANNA WILLIAMS were described as too numerous to count. She had at least 15 wounds in the left breast which were described as slash wounds causing it to be nearly severed. He described wounds literally all over her body and was of the opinion that the wounds were made by two different knives, one a smaller knife inflicting stab wounds approximately one-quarter inch wide and one inflicting wounds three-quarters of an inch wide and approximately six inches long. It might be noted here that in the testimony of WILEY WILLIAMS, SR., he discovered a knife missing from the kitchen which was used to cut meat which had a long blade and was approximately one inch wide at the broadest point. The cause of death of ANNA LOUISE WILLIAMS was internal hemorhaging [sic] from the stab wounds she received.
The trial ended November 4, 1975, with the jury of 12 people finding the Defendant, JESSE RAYMOND RUTLEDGE, guilty of murder in the first degree of ANNA LOUISE WILLIAMS as alleged in Count One of the indictment; guilty of murder in the first degree of WILEY *979 WILLIAMS, JR., as alleged in Count Two; guilty of assault with intent to commit murder upon HAROLD WILLIAMS as alleged in Count Three; and guilty of assault with intent to commit murder upon ANDREW WILLIAMS as alleged in Count Four.
Subsequent to the filing of notice of appeal here, this Court by order directed the trial judge to disclose whether he, in imposing the death sentence, considered any information not known to the appellant. A response has been filed by the trial judge which indicates that the death sentence imposed by the court was not done through consideration of any information not known to the defendant/appellant and his counsel. Cf. Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).
Appellant first alleges that the trial court erred in not discharging him pursuant to the speedy trial rule. Review of the record evinces no violation of the speedy trial rule so as to warrant discharge. Inter alia, appellant was still engaged in discovery beyond the speedy trial rule time and, thus, was not continuously available for trial as contemplated by Fla.R.Crim.P. 3.191.
Although expressly recognizing that this is not a case of prosecutorial misconduct, appellant next argues that he was prejudiced because the tape recording of the murder was briefly mentioned in the state's opening statement. This recording was subsequently ruled inadmissible in the guilt-innocence portion of the trial because the judge determined that, insofar as having any probative value, it was unintelligible and subject to speculation as to any words spoken having probative value. The judge explained that the only clear and intelligible portion of the tape are the moans, cries and pleas of the victims, none of which have probative value as to the guilt of the defendant. The disputed statement reads:
And on that tape I think you will find that people inside that house, one of the children anyway, identifies for you the person attacking them that will be "Ray."
Prior to opening statements, the judge heard arguments of defense counsel and prosecution as to whether it would be permissible to mention the tape in opening argument. Although not ruling on the admissibility of the tape at this juncture, the trial court permitted the prosecutor to make reference to the tape in opening argument. Prior to the prosecutor's opening argument, the judge explicitly instructed the jury that the opening statements are not to be considered by the jury as evidence in the case. In the commencement of his opening argument, the prosecutor reiterated that nothing he said was to be considered evidence. The defense, in opening argument, also made references to the tape. Upon review of the entire record of evidence before us and the totality of the circumstances, we find no reversible error in the prosecutor's reference to the tape.
Appellant next argues that Harold Williams, the nine year old eyewitness of the crime, who was able to survive thirty-two stab wounds in his body to testify against the appellant and to make a positive identification of appellant as the perpetrator of these crimes, was incompetent to testify as a matter of law. Where a witness of tender years is offered to testify in a criminal case, posits appellant, the law establishes that it is the duty of the trial judge to ascertain whether the child has sufficient intelligence and understanding of the motive and obligation of an oath so as to be a competent witness. It is within the sound discretion of the trial judge to decide whether an infant of tender years has sufficient mental capacity and sense of moral obligation to be competent as a witness, and his ruling will not be disturbed unless a manifest abuse of discretion is shown. Rowe v. State, 87 Fla. 17, 98 So. 613 (1924). Sub judice, the prosecutor examined Harold Williams to determine his competency to testify. In Fernandez v. State, 328 So.2d 508 (Fla. 3rd DCA 1976) cert. den. 341 So.2d 1081 (Fla. 1976), the Court determined that questioning by the prosecutor as to competency of a child was an acceptable procedure. *980 An examination of the record indicates no abuse of discretion on the part of the trial judge in permitting Harold's testimony.
The other points raised on appeal by appellant directed to his conviction are likewise without merit.
We have listened carefully to oral argument, examined and considered the record including the voir dire examination, in light of the assignments of error and briefs filed, and we have also, pursuant to Fla.App. Rule 6.16(b), reviewed the evidence to determine whether the interests of justice require a new trial, with the result that we find no reversible error is made to appear and the evidence in the record before us does not reveal that the ends of justice require that a new trial on the issue of guilt be awarded.
Relative to the sentencing portion of the trial, we find that there was nothing violative of appellant's constitutional rights.
The trial judge carefully examined each of the mitigating and aggravating circumstances in his written statement of findings and properly concluded that the death penalty was warranted. As to the atrocious and heinous nature of these crimes, the trial judge explained:
The Defendant in this case literally butchered to death ANNA LOUISE WILLIAMS and her oldest son, WILEY WILLIAMS, JR., by repeatedly slashing and stabbing them and applied the same cruel stabbing and slashing to her two younger children. ANNA LOUISE WILLIAMS was only 27 years old; WILEY WILLIAMS, JR., was only 10 years old; HAROLD WILLIAMS was only 9 years old; and ANDREW WILLIAMS was only 7 years old.
The evidence shows that while committing these atrocious acts the sobbing pleas of the mother and children were heard by the operators at the telephone company and the Sheriff's Office. The tape recording made of their pitiful screams and pleas was not permitted in evidence in the first stage of the trial nor was the photograph of the mother showing her left breast nearly severed from her body. However, in the second stage of the trial the tape recording was played before the jury and the photograph was admitted for their consideration. The faces of the jurors were white as well as the face of the Court. It was as though we were all in the home witnessing the acts of the Defendant. One could almost visualize the stroke of the knife as the mother and each of her children would scream. The defendant was heard to say "bleed, bleed, bleed; die, die, die" and a filthy reference this Court will not record in this judgment. The nerve-wrecking screaming, pleading and crying lasted approximately 23 minutes. However, due to the tremendous emotional impact of the taped voices upon the jury and persons in the courtroom the State Attorney directed the operator of the tape equipment to stop the tape after several minutes; but not until the references referred to above had been heard. The Court, however, heard the entire tape; and it is filed in evidence in this case as a part of the second trial stage. One could clearly hear the footsteps of the father returning home from his second job that morning and hear his cries and moans of "Anna, Anna! Oh God! What happened boys? Who did this to you? Oh Lordy!" and his further responses as he would locate each member of his family in turn seeing their bloody condition.
We find that these crimes clearly fall within this Court's contemplation of "especially heinous, atrocious, or cruel" as enunciated in State v. Dixon, 283 So.2d 1 (Fla. 1973).
Accordingly, finding no reversible error and determining the death penalty to be warranted, the judgments and sentences are affirmed.
ADKINS, BOYD, OVERTON and SUNDBERG, JJ., concur.
ENGLAND, C.J., dissents.