660 So.2d 1152 (1995)
Michael Bush HAMMOND, Appellant,
v.
STATE of Florida, Appellee.
No. 94-02262.
District Court of Appeal of Florida, Second District.
September 22, 1995.
*1153 James Marion Moorman, Public Defender, and Jennifer Y. Fogle, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and William I. Munsey, Jr., Assistant *1154 Attorney General, Tampa, for Appellee.
FRANK, Judge.
Michael Bush Hammond, who was convicted of committing lewd and lascivious acts, committing sexual batteries on mentally defective victims, and engaging in sexual activity while in a position of familial or custodial authority, has appealed on numerous grounds. Because the trial was infected with multiple errors, we reverse.
Two of the three youngsters who accused Hammond of various sexual acts were students of John Conklin at Lavoy Exceptional School; the third boy was a cousin of one of the other two. Hammond was a close friend of Conklin, who had rented a room to him for the previous thirteen years, and the two had lived together in Fort Myers and Ohio for sixteen years prior to moving to Tampa. Conklin was charged separately in this case and received a nonincarcerative sanction. Although Hammond had worked briefly at Lavoy in 1986, at the time of his arrest he worked as a teacher's aide in a school for the emotionally disturbed and emotionally handicapped at Northside Mental Health Center, and he also served as a part-time aide at Angels Unaware, a group home for developmentally disabled adults. On weekends he often maintained a booth at a flea market. During the period of the allegations of wrongdoing, Hammond twice appeared as the Santa Claus at the Lavoy Christmas party and he volunteered a pottery demonstration on another occasion, but he otherwise maintained no relationship with Lavoy.
Jimmy Allen, Charlie Thomas, and Ricky Steadman became acquainted with Hammond because Conklin would invite them to spend the night at his home. Although this practice was not approved by school officials, apparently it was not unusual for Lavoy teachers or those at other schools for the mentally handicapped to invite their students home to help them learn community and everyday life skills. Hammond, however, did not like Conklin's practice of allowing the young men to visit, particularly when Conklin was absent. If they rode their bikes to the Conklin home when Hammond was there alone, he would not permit them to stay. At least once Hammond confronted Conklin about the children, and their verbal differences escalated into a pushing and shoving match.
Over objection by defense counsel, the trial court found Jimmy Lee Allen, seventeen, who had an IQ of 50 and a mental age of six to eight, competent to testify. Jimmy said he went to Lavoy School from the time he was thirteen until he was fifteen, where his favorite teacher was Mr. Conklin. Jimmy first agreed with the prosecutor that while he was a student at Lavoy, Conklin took him on trips off the school campus and took him to Conklin's home, sometimes for overnight visits. However, Jimmy later said that he started going to Conklin's house when he was sixteen, and his visits there were over the course of one year. Jimmy knew that the Conklin house was red, but he could not remember its exact location. He also knew that Mike Hammond lived there.
Jimmy had his own upstairs bedroom at Conklin's house, where he slept alone. Jimmy testified that on one occasion when he was sixteen, he was seated on the downstairs sofa when Hammond touched his penis to the outside of Jimmy's mouth on his upper lip. Hammond's penis did not penetrate Jimmy's mouth, because Jimmy moved his face away. Jimmy did not know what time of year this happened. When asked if it happened in 1990, 1991, or 1992, Jimmy responded it happened all year. He said, "Yep," in response to the question, "It happened all year one time?"
Over objection, Jimmy testified that Conklin and a man named Preston did other things to him at other times. Jimmy never said anything about any incidents with either Hammond or Conklin until he talked to the police. The defense impeached Jimmy with his deposition, in which he admitted that he had told the police he had made up his initial allegations against Conklin, explaining that he was jealous and angry at Conklin for paying attention to other kids. Jimmy agreed that it might be true that he threatened to get Conklin or Hammond in trouble.
*1155 Eighteen-year-old Charlie Thomas, who had an IQ of 45 to 50 and a mental age of five or six, was found competent to testify over defense objection. Charlie went to Lavoy School from the time he was thirteen until he was seventeen. Charlie used to visit Conklin on the weekends at Conklin's house. Other kids, including Charlie's brother J.B., Jimmy Allen, and Ricky Steadman, would also play there.
Charlie testified that when he was sixteen, Hammond once pulled down Charlie's pants and then put Charlie's penis in his mouth. Charlie tried to get away but could not. He did not know what time of year this incident occurred, but he thought that it happened in the living room at night when he first started going over to Conklin's. He continued to visit Conklin's house until he was eighteen because he and his brother had a Nintendo over there. Charlie never told anyone about the incident. When first questioned by the school principal, an HRS representative, and the investigating detective about what had happened, Charlie did not say anything. When reminded of his previous statements, Charlie could not remember having said that Mr. Hammond only touched his penis.
The competency of Ricky Steadman, who was thirteen years old but had a mental age of eight to ten, also was at issue. Ricky testified that he first went to Conklin's house when he was eleven or twelve, and there were other kids there at the same time. During the first week he started going to Conklin's house, Ricky went into Mr. Hammond's room to change clothes. There Hammond pulled down Ricky's pants and molested him. Ricky stated that, while he was standing up, Hammond stuck his penis inside his "butt." On cross examination Ricky admitted that he had initially said that the incident occurred with Hammond on top of him on the bed, but when reminded that Hammond's 300-pound-plus weight could have crushed him, he changed his mind and said the incident happened when he was standing up. Ricky felt that this occurred sometime around the month of February, but he was not sure in what year.
Two or three years later Ricky told his mother about what Hammond had done to him. About two months after his mother had called the police and he had described the event to an officer, after Jimmy Allen had gotten into some trouble, Detective Townly began questioning Ricky about the incident. Ricky said that he talked to the detective after having been told by some other kids that he could sue and get money. The detective and a man named Mike Atkins from HRS took him out to eat many times, bought him a basketball, and talked to him about the molestation almost every day until the trial.
Ricky knew he was thirteen years old at the time he was testifying (April 1994) and that his birthday was in September. However, he thought he was twelve years old the past December (1993) and that he turned eleven in 1991. Ricky alleged that everything happened in the first week he went to the Conklin home but that he was never molested again. Ricky's IQ was 90, in the borderline range between normal and mentally deficient.
We have detailed the testimony of the accusers because the prosecution's entire case essentially rested upon their shoulders. No medical evidence corroborated their allegations, possibly because of the passage of time. Although all of the boys testified that other boys were at the Conklin home when they visited, there were no witnesses to any of the alleged lewd acts. Hammond testified in his own behalf, denying all of the charges. The defense theory was that the boys were angry with Hammond for not welcoming them into the Conklin home, so they accused him of these acts to make trouble for him.
Against this background Hammond has raised several meritorious issues on appeal. First, Hammond was convicted of two counts of engaging in sexual activity while in a position of familial or custodial authority. The evidence is insufficient to sustain these convictions. In Hallberg v. State, 649 So.2d 1355, 1355 (Fla. 1994), the supreme court found that "a teacher without any teaching responsibility or extracurricular activity supervisory authority over a child during a summer recess, is not in a position of custodial authority."
*1156 The facts of this case provide far fewer indicators of custodial authority than Hallberg. Hammond was not the boys' teacher; he did not even work at the school they attended. He did not own the home where these incidents allegedly occurred, but only rented a room from Conklin, who was the teacher of two of the children. Hammond apparently did not even want the children to be around, particularly if Conklin was not present. Although the evidence might suggest that Conklin had some custodial authority over the boys who were his students, that authority did not extend to Hammond. For this reason, Hammond is entitled to discharge on Counts 7 and 13 of the amended information. The appellant's double jeopardy issue raised as to these counts is moot.
As is apparent from the outline of the boys' testimony, competency to testify was an important issue in this case. The trial judge failed to make the specific determinations necessary to find these mentally challenged youth competent in this regard. Rather, it appears that the judge found them competent after asking the boys some extremely leading and suggestive questions. In the case of Charlie Thomas, the judge did consider the testimony of Dr. Edward White, a psychologist, who briefly described  out of the presence of the jury  the abilities and limitations of a mentally defective person to relate events and understand abstractions such as truth and the meaning of an oath. Dr. White opined that Charlie was competent to testify, and the judge agreed. However, the court did not address "(1) whether the child is capable of observing and recollecting facts, (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth." Kertell v. State, 649 So.2d 892, 893 (Fla. 2d DCA 1995) (citing Lloyd v. State, 524 So.2d 396 (Fla. 1988)); Griffin v. State, 526 So.2d 752 (Fla. 1st DCA 1988). An observation made by the Griffin court is of equal import here: "Where ... the critical facts are totally dependent on the child's observations and ability to recall and to recount those observations accurately, the competency determination of the child as a witness is of increased significance." 526 So.2d at 755.
This competency determination is of heightened importance when the witness is mentally retarded, because there might exist a tendency on the part of the jurors to believe that the retarded are not capable of conniving or fabrication. Such was the opinion of the trial judge in McKinnies v. State, 315 So.2d 211 (Fla. 1st DCA 1975), where the state's witness in a grand larceny case was a sixteen year old boy whose ability to understand the meaning of testifying under oath was in question. The child did not know what an oath meant, and many of his answers were in response to leading questions. The first district held that the trial court had abused its discretion in permitting the witness to testify and noted that the "test of competency of a witness is his intelligence and ability to understand, not his age." 315 So.2d at 213 (citing Hall v. State, 260 So.2d 881 (Fla. 2d DCA 1972)).
The voir dire of these witnesses, especially Jimmy and Charlie, did not establish them as competent witnesses. Their answers indicated only that they possibly knew the difference between the truth and a lie, but their responses did not suggest that they felt a moral obligation to tell the truth, nor did they demonstrate an ability to relate facts to the jury. In light of their actual trial testimony, which contained inconsistencies, omissions of details, and incoherence concerning time and sequence, the failure to make a complete competency determination constituted reversible error. On remand, the trial court should make specific findings on this issue.
The court also erred in failing to allow Hammond to elicit testimony concerning the critical issue of the victims' prior sexual knowledge. The judge made an in camera inspection of the juvenile dispositions and psychological examination of Jimmy Allen, who had been convicted of four counts of sexual battery on Ricky Steadman, some of which occurred at the Conklin home. However, some of the incidents took place in other locations before Ricky ever met Conklin or Hammond. After allowing extensive argument by the state and the defense, the *1157 judge would not permit the jury to hear this evidence. This was error.
Because of the mental deficiencies of these boys, the jury was likely to perceive them as naive, innocent, and unable to imagine sexual activity in detail. The fact that the prior sexual conduct had occurred would have affected the jury's evaluation of the accusers' testimony. As in Dixon v. State, 605 So.2d 960 (Fla. 2d DCA 1992), and Lewis v. State, 591 So.2d 922 (Fla. 1991), when "classic credibility" contests are involved, the defendant's right to confront his accusers takes precedence over the rape shield law. Because the charges against Hammond were grounded entirely upon the accusations of these mentally challenged youngsters, it cannot be said that the failure to allow the defendant to explore further the source of their sexual knowledge was harmless error. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
The court also abused its discretion in failing to sever these offenses. The state was unable to prove a temporal relationship between the crimes, which were alleged in the informations to have occurred over a 2 1/2 year period. The offenses were similar to each other only in that they were sexual in nature and occurred at the Conklin home. To the extent that the court found similarity in the offenses from the custodial authority of the defendant, that finding was erroneous.
In Roark v. State, 620 So.2d 237, 239 (Fla. 1st DCA), rev. denied, 629 So.2d 135 (Fla. 1993), the court stated that it was error not to sever offenses that "were related only in that they were sex offenses occurring within the same seven month period, the victims were related to each other, and appellant allegedly was guilty." In this case the victims knew each other; two were cousins and two were students at the same school; but there is no episodic connection between the alleged offenses. The charges should have been severed. See Wallis v. State, 548 So.2d 808 (Fla. 5th DCA 1989); Ellis v. State, 534 So.2d 1234 (Fla. 2d DCA 1988).
Finally, because retrial will be necessary in this case, we need not address the sentencing issues raised by the appellant. We do note, however, that the inclusion of victim injury points based upon Karchesky v. State, 591 So.2d 930 (Fla. 1992), will depend upon whether the events occurred before the effective date of section 921.001, Florida Statutes (Supp. 1992), a fact that cannot be determined from our review of this record.
Based upon the foregoing, we reverse; we vacate the convictions on Counts 7 and 13 (engaging in sexual activity while in a position of familial or custodial authority); and we remand for retrial on Counts 1, 4, and 12.
CAMPBELL, A.C.J., and QUINCE, J., concur.