683 So.2d 1101 (1996)
Cecil Cameron SIMMONS, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 94-539.
District Court of Appeal of Florida, First District.
November 26, 1996.
Robert W. Pope of Pope & Henninger, P.A., St. Petersburg, for appellant.
Robert A. Butterworth, Attorney General; Daniel A. David, Assistant Attorney General, Tallahassee, for appellee.
PER CURIAM.
This is an appeal from convictions for murder, sexual battery (two counts), and kidnapping. Appellant essentially raises three issues on appeal: (1) Whether the trial court erred in finding the witness James Burney competent to testify; (2) whether the trial court erred in denying appellant's motion for *1102 a psychological evaluation of Burney; and (3) whether the trial court erred in preventing appellant from impeaching Burney with a history of retardation and suggestibility. We find no error and affirm.
The victim, a young woman who was apparently driving alone on an interstate highway at night, had summoned a wrecker by using a roadside call box. Her call was received by the Florida Highway Patrol and relayed to a wrecker service between two and four o'clock on the morning of Friday, June 15, 1990. Separate highway patrolmen as well as the wrecker driver reported stopping at the car they say had been abandoned. Around noon on Sunday, June 17, 1990, the young woman's body was found in a shallow creek approximately 100 miles from where her car had been abandoned.
The police were unable to find the persons responsible for the young woman's death for approximately one year after the crime was committed. The police learned about the possible involvement of James Burney on June 27, 1991. After repeated questioning, Burney implicated the appellant and his brother (Simmons brothers) in the kidnapping, rape, and murder of the young woman. Burney testified that he saw the Simmons brothers and the victim in James Simmons' truck. Burney then stated that he joined the parties in the truck and went for a ride that ultimately resulted in Burney witnessing the Simmons brothers raping and killing the victim. The physical evidence presented was consistent with Burney's version of events, but Burney's testimony was the only evidence tying the Simmons brothers to the crime.
Prior to trial, appellant moved (1) to declare Burney incompetent, (2) to authorize a psychological evaluation of Burney, and (3) to allow the defendant to introduce Burney's school records (which included prior psychological testing).
Following a hearing, the trial court ruled that "based upon the evidence before me, it is not possible for this Court to make a finding as a matter of law ... that ... Mr. Burney is not competent to testify." The court also denied the other relief requested in the motion.
At trial, before James Burney testified, the defense renewed its motion to declare him incompetent. The trial court denied the motion with the assurance that the court would, if the question was raised properly, "make a determination as to the competence of the witness ... and ... make findings accordingly."
After direct examination, the defense again renewed its motion to declare Mr. Burney incompetent as a witness. This time the trial court ruled:
I have heard the testimony of the witness [on direct], have heard the witness recite a historical background. I have heard him recite an employment background. I have heard him recite a factual background.
He appears to be oriented in terms of time, place and location. He appears to appreciate the difference between a true factual statement and a nontrue factual statement.
... I would posit those observations are based solely on the presentation of the state's case. I have not as yet received evidence from the defendant. You are always welcome to raise a challenge.
Following Burney's testimony, defense counsel returned to the issues raised in the pretrial motion. Dr. Bedinger testified. He was the senior psychologist for Developmental Services for the local district of the Department of Health and Rehabilitative Services, with particular expertise in the area of mental retardation. Dr. Bedinger asserted that "a person could be overall competent and not be competent to be a witness"; however, Dr. Bedinger was not comfortable offering an opinion on Burney without first doing a complete evaluation. The trial court expressed some skepticism about whether Dr. Bedinger could provide any useful information to supplement the court's own observations concerning Burney's competence, and asked whether "there's something unique and special about retardation that retarded people have a different standard of differentiating between the truth and a lie?" Dr. Bedinger replied that "many people with retardation have a clearly different standard," *1103 and noted that he was concerned about Burney's statement during cross-examination where Burney said that he "thought [he] was telling the truth." However, Dr. Bedinger said that such a statement "is indicative, not conclusive, that [Burney] is not competent as a witness." Dr. Bedinger reiterated that he was reluctant to offer an opinion on Burney's competence without a personal evaluation.
The trial court denied defendant's renewed motion to either declare Burney incompetent or have him evaluated, finding that "the witness has demonstrated the capacity to differentiate between the truth and a lie and has demonstrated the capacity to relate in an understandable fashion those events about which he chooses to testify." The court also denied defendant's request to introduce Burney's school records (including the psychological testing) and defendant's request to have Dr. Bedinger explain the significance of such records with respect to Burney's suggestibility and his ability to accurately recall the matters about which he testified. The court ruled that the records were too remote to be relevant.
The trial court announced its final ruling that Burney was competent as follows:
This court finds that based upon [Burney's] statement of the historical development that he has undergone, his attendance in school, performance in school, his ability to maintain friendships over a period of years, his ability to be employed, his ability to be able to obtain a driver's license [despite his illiteracy], his ability to operate a motor vehicle, his ability to operate a motor vehicle in the course of his employment, his ability to make decisions and judgments predicated thereon, his ability to understand culpability, to acknowledge culpability in the form of his prior misdeeds ... the fact that [Burney] to some extent is corroborated by some other witnesses in this case in terms of the incidents that he has related, to the extent that he has testified untruthfully [sic] in progressive fashion and has only when challenged given more and more informationhe has described his reluctance to do that. He has described his response to intimidation. He has demonstrated the capacity to relate facts, to relate explanations.
The one questionable criteri[on] is as a consequence of a series of questions derived there at the end after some six hours of testimony and, while it is true that there is no certitude in life, I find that the witness has demonstrated the capacity to differentiate between the truth and a lie and has demonstrated the capacity to relate in an understandable fashion those events about which he chooses to testify.
Appellant challenges the ruling relating to Burney's competency.
Unless otherwise provided by statute, every person is presumed competent to testify. § 90.601, Fla.Stat. A person may be disqualified to testify if the court determines that the person is incapable of expressing himself or herself so as to be understood, or is incapable of understanding the duty of a witness to tell the truth. § 90.604, Fla.Stat. It is within the sound discretion of the trial judge to determine the competence of a witness to testify. Rutledge v. State, 374 So.2d 975 (Fla.1979), cert. denied, Rutledge v. Florida, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980); Kaelin v. State, 410 So.2d 1355 (Fla. 4th DCA 1982).
The subject of a mentally challenged individual's competency to testify at trial was discussed in Hammond v. State, 660 So.2d 1152 (Fla. 2d DCA 1995). In Hammond, the second district reversed for a new trial, finding that the trial court erred by failing to make the three specific determinations necessary to determine that the mentally challenged victims were competent to testify. Citing cases dealing with the competency of child witnesses, the Hammond court stated that the trial court had failed to determine whether the witnesses (1) were capable of observing and recollecting facts, (2) were capable of narrating facts to the court or jury, and (3) had the moral sense of the obligation to tell the truth. Id. at 1156. The Hammond court went on to note that the "competency determination is of heightened importance when the witness is mentally retarded, because there might exist a tendency on the part of the jurors to believe that the retarded are not capable of conniving or fabrication." *1104 Id. (citing McKinnies v. State, 315 So.2d 211 (Fla. 1st DCA 1975)).
This court addressed a similar situation in McKinnies, where the issue was whether the trial court erred in holding a mentally challenged 16-year-old boy competent to testify. In McKinnies, as in Hammond, the testimony of the witness in question was crucial to sustaining a conviction. McKinnies, 315 So.2d at 212. Although the McKinnies court did not state whether the trial court made the proper findings, it concluded that based on the record the trial court could not have found the witness competent. This court stated that the "test of competency of a witness is his intelligence and ability to understand, not his age." Id. at 213 (citing Hall v. State, 260 So.2d 881 (Fla. 2d DCA 1972)). In McKinnies, this court found that the answers the witness gave through leading questions were so confusing and contradictory that there was no probative value, and emphasized that at no point did the witness amplify on any question, or answer in anyway except "yes" or "no" or by repeating a portion of the words asked by questioners. In McKinnies, we reversed and remanded for a new trial, noting that although the trial court has very broad discretion in determining the competency of a witness, it is not without bounds, and the exercise of discretion is subject to appellate review. Id. at 213.
The instant case is easily distinguishable from both Hammond and McKinnies. In Hammond, the trial court erred because it did not address the three factors required to determine competency. In this case, however, the court did make the proper findings: The court found that Burney was capable of observing facts as was evidenced by his ability to be employed, to obtain a driver's license, and to operate a truck; the court found that Burney demonstrated the capacity to relate facts and explanations; and the court found that the witness demonstrated the capacity to differentiate between the truth and a lie and "demonstrated the capacity to relate in an understandable fashion those events about which he chooses to testify." Unlike the situation in Hammond, the relevant factors were addressed in this case. Furthermore, in this case, unlike Hammond, there was physical evidence corroborating Burney's testimony (i.e., lack of semen and the victim's menstrual cycle, missing ring, cigarette marks and other injuries).
The McKinnies case, while having more points of similarity, is also distinguishable. Burney's testimony was not in a "yes" and "no" pattern, and his testimony was not only probative, but also comprehendible. Unlike the witness in McKinnies, once Burney told his story, he stuck by it and presented a plausible account of the events. A careful reading of the testimony of Dr. Krop, the original doctor presented by the defense, provides nothing that required a finding that Burney was incompetent to testify. Dr. Krop had never met or talked to James Burney, but only spoke of retardation in the generic sense. The strongest statement made by Dr. Krop was that a person with mental retardation could still be competent to be a witness, but there was "a higher probability that a person at this level would not be competent." That is not enough to disqualify a witness, who, if believed, was an eyewitness observer of the torture and death inflicted upon the victim.
Appellant also challenges the court's denial of a psychiatric evaluation of Burney. A large number of the cases involving courtordered examinations involve victims who are called to testify; however, this rule of law should be applicable to all witnesses, not just victims. See generally Murphy v. Superior Court for Maricopa County, 142 Ariz. 273, 689 P.2d 532 (1984) ("The standard for determining when a witness should be ordered to undergo a mental examination is no different for sex crime victims than for other witnesses."). In Ballard v. Superior Court of San Diego County, 64 Cal.2d 159, 49 Cal. Rptr. 302, 410 P.2d 838 (1966), the case upon which courts in many other states rely, the California Supreme Court stated:
We submit ... that a general rule requiring a psychiatric examination of complaining witnesses in every sex case or, as an alternative, in any such case that rests upon uncorroborated testimony of the complaining witness would, in many instances, not be necessary or appropriate.... *1105 Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to order a psychiatric examination of the complaining witness.
Id., 49 Cal.Rptr. at 313, 410 P.2d at 849. The Ballard court also noted that a "complaining witness should not, and realistically cannot, be forced to submit to a psychiatric examination or to cooperate with a psychiatrist." Id.
In Hudson v. State, 368 So.2d 437 (Fla. 3d DCA 1979), cert. denied, 381 So.2d 767 (Fla.1980), the trial judge denied the motion for evaluation after he conducted a personal examination of the victim and was satisfied as to the victim's competency to testify. The third district held that it was not an abuse of discretion to deny the defendant's motion for a psychological examination of a victim notwithstanding the fact that the victim had a history of "psychiatric disorder."[1] In State v. Camejo, 641 So.2d 109 (Fla. 5th DCA 1994), opinion adopted, 660 So.2d 242 (Fla.1995), the fifth district found that, despite allegations of a witness' history of violence and mental instability, a psychological examination was not warranted. The mere fact that a witness is retarded or may have a history of mental problems is also not enough to compel an evaluation. People v. Neely, 228 Cal.App.2d 16, 39 Cal.Rptr. 251 (1964) (affirming denial of psychological evaluation of victim who was inmate of state mental hospital); Fulton v. State, 352 So.2d 581 (Fla. 3d DCA 1977) (psychological evaluation of allegedly mentally unstable witness unnecessary).
Similarly, in State v. Coe, 521 So.2d 373 (Fla. 2d DCA 1988), where the defendant alleged that the victim/witness suffered from alcoholism, that she was in a jealous relationship with her boyfriend, and that the victim gave conflicting accounts of the attack, the court reversed the trial court's order requiring the complainant to undergo psychiatric evaluation. Id. at 373-374. The court noted that even if it accepted the defendant's allegations as true, the reasons were not strong or compelling enough to suggest that an examination was required to prevent a miscarriage of justice. Id. at 376.
In the instant case, the trial court reviewed depositions given by the witness Burney, and had an opportunity to hear and observe Burney's trial court testimony. Review of the record on appeal reveals that but for one notable exception, Burney's testimony was complete, responsive, and consistent with his deposition testimony. The court noted that Burney's testimony concerning events was consistent with the physical evidence and indicated that it was taking Burney's retardation into account in determining competency. We cannot say that the trial court abused its discretion in determining that those factors outweighed the factors outlined in the dissenting opinion, which would support ordering a psychological evaluation.
As to the denial of appellant's request to admit the school records which were over ten years old, there was no reversible error. The records were simply outdated and irrelevant to the trial of this case. Furthermore, they were not at all inconsistent with what was admitted and clearly visible to all, that is, that the witness suffered from mild retardation.
Affirmed.
JOANOS and WOLF, JJ., concur.
BENTON, J., dissents with written opinion.
BENTON, Judge, dissenting.
In this appeal from convictions for murder, sexual battery (two counts), and kidnapping, testimony from persons who found, saw, and, in one case, examined the corpse, established the corpus delicti on the murder count. The *1106 very occurrence of the other crimesas well as appellant's identity as perpetrator of all of the crimeshangs on the testimony of a single individual, one James Burney. Substantial evidence raised a genuine question about whether Mr. Burney, who is mentally retarded, appreciated his obligation to testify truthfully. But the trial court made no finding that Mr. Burneywhose competence as a witness was repeatedly challengedhad sufficient understanding to comprehend the nature and obligation of his oath as a witness; and denied a defense motion for appointment of a psychologist to interview and evaluate him. A new trial is in order.
No physical evidence linked appellant or his brother, whom James Burney also accused, to the victim's car. No physical evidence linked either of them to the corpse; in fact, the only hair (that did not belong to the victim) found with the corpse was determined not to be appellant's or his brother's. Several alibi witnesses testified on behalf of the Simmons brothers.
But the testimony of James Burney proved damning. After repeated formal interrogations, uncounted informal conversations with the authorities, and two depositions, Mr. Burney testified against appellant at trial. Questioned about the different versions he had given investigatorsbeginning with the assertion that he lacked knowledge of events and ending with the claim that he participated with appellant and his brother in the rape and murder of the young womanMr. Burney testified as follows:
Q Okay. Isn't it true that you didn't say you knew anything about Cecil Simmons being involved in this until you believed you were going to be arrested?
A Not that I know of.
Q Didn't you talk to Bill Davis?
A I talked to him.
Q And weren't you aware from talking to him that he didn't believe that you told him everything?
A That's true, he didn't believe me.
Q As a matter of fact, he told you he thought you were lying?
A Yes.
Q And he told you that if you were lying you could be arrested?
A Yes.
Q And isn't that when you first started to say anything about Cecil Simmons?
A Yes.
Q Only when you were afraid of being arrested?
A Yes.
Q Okay. Mr. Burney isn't it true that even when you started to tell them that you had heard some talk at the Circle K, that you didn't tell them everything that you've testified to today?
A Not right then.
Q And they told you then that they didn't believe you, the police?
A Yeah.
Q And they told you then that they were convinced that you knew more?
A Yes.
Q So, you knew they weren't satisfied with what you had said at that point?
A Yes.
Q So, that's when you started to tell them more?
A Yes.
Q And even then, they told you they still thought you weren't telling the full truth?
A Yes.
. . . .
Q When you talked to these police before you told them this, weren't you telling them that you were telling the truth?
A No.
Q You were telling them that you were lying to them?
A They knew I was lying.
Q But my question is, were you telling them that you were telling the truth or were you telling them that you were telling them a lie?
A I thought I was telling the truth. They knew I wasn't.
Q I'm sorry?
A I thought I was telling them the truth, but they knew I was lying.

*1107 Q You thought you were telling them the truth
MR. McMAHON: Your Honor, again, improper question. He's trying to rephrase the same answer.
MR. MOLLICA: I'm trying to make sure I understood the answer.
THE COURT: My concern, Mr. Mollica, is it was a compound question with two alternatives. You got a compound answer. If you'll back up and start the line of inquiry again, one point at a time, so we may not have a problem.
Q When you were telling them what you were telling them, did you think you were telling the truth?
A Yes.
Q And they told you they weren't satisfied with that?
A Yes.
Q So, you changed what you told them?
A Yes.
. . . .
Q Mr. Burney, isn't it true that you really don't know about the events of June 15th, 1990, as they relate to Kristi Hedden?
A No.
Q No, you don't?
A (Witness nods head affirmatively.) Yeah.
MR. MOLLICA: No further questions.

Issue Preserved
The question of James Burney's competence as a witness was raised several times and considerable evidence was adduced on the question, although Mr. Burney himself was never examined in court before he testified at trial. At the pretrial hearing on the motion challenging Mr. Burney's competence as a witness, defense counsel contended that the trial court had an "obligation ... to determine ... that the individual does in fact understand the obligation to tell the truth, does in fact understand what the compulsion of the oath is, and what the compulsion of telling the truth is." Defense counsel argued that "with his functioning level, he does not understand or appreciate that he has the obligation to tell the truth." Like contentions at trial also failed to elicit a ruling on whether James Burney was in fact "capable of understanding the duty of a witness to tell the truth," or whether he felt himself under such a duty. At no point did the trial court find that James Burney had the ability to understand the duty of a witness to tell the truth, or that he believed himself to be under any legal or moral obligation to testify truthfully. "Defense counsel placed [Burney's] competency at issue, at least to the extent of whether [he] had a moral sense of the duty to tell the truth." Z.P. v. State, 651 So.2d 213, 214 (Fla. 2d DCA 1995).

Findings and Inquiry Inadequate
"Every person is competent to be a witness, except as otherwise provided by statute." § 90.601, Fla.Stat. (1995). But a "person is disqualified to testify as a witness when the court determines that he is: ... (2) Incapable of understanding the duty of a witness to tell the truth." § 90.603, Fla.Stat. (1995). See Bell v. State, 93 So.2d 575, 577 (Fla.1957) ("[T]here is really no substitute for the spiritual and moral consciousness that should be the basic inducement to all witnesses to speak the truth.").
"Children and individuals suffering from a mental impairment are competent to testify in the same situations in which they were competent prior to the enactment of the Code." Ehrhardt, Florida Evidence, § 603.1, at 350 (1996). "To allow a child to testify, a trial judge must find that the child `... appreciates the need to tell the truth.'" State v. Ford, 626 So.2d 1338, 1347 (Fla.1993) (citation omitted); Kertell v. State, 649 So.2d 892, 894 (Fla. 2d DCA 1995) (reversing for lack of "sufficient findings of fact to support its determination"); Wade v. State, 586 So.2d 1200 (Fla. 1st DCA 1991) (same). An early case discussed children's competence as witnesses:
This is in line with established principle that "whether an infant of tender years has sufficient mental capacity and sense of moral obligation to be competent as a witness is a question for the discretion of the trial judge, and his ruling in that regard *1108 will not be disturbed, except in case of a manifest abuse of discretion, or where the witness is admitted or rejected upon an erroneous view of a legal principle." 16 Amer. & Eng.Ency. of Law (2d Ed.) 270, and authorities cited in notes; Underhill's Criminal Evidence, § 205. It was also an established principle at common law that an infant under the age of 14 years was presumptively incompetent to testify as a witness, especially in a criminal trial, and that the competency of such infant must be shown to the satisfaction of the court. "It is the duty of the court, when such a witness is offered, to examine him and ascertain whether he has sufficient intelligence and understanding of the nature and obligation of an oath to be a competent witness, and the court should carry such investigation far enough to make the infant's competency apparent." 16 Amer. & Eng.Ency. of Law (2d Ed.) 267. But, as is said on page 268 of the last-cited authority: "Intelligence, and not age, is the proper test by which the competency of such witnesses must be determined; and, where it appears that an infant has sufficient intelligence to receive just impressions of the facts respecting which he is to testify, and sufficient capacity to relate them correctly, and has received sufficient instruction to appreciate the nature and obligations of an oath, he should be admitted to testify, no matter what his age." We also approve of what is said on page 270, to the effect that: "Where it appears to the presiding judge that the witness does not sufficiently understand the nature and obligations of an oath, it is within his discretion to permit the child to be properly instructed in that respect and afterward to be sworn, provided such child to be of sufficient age and intellect to receive instruction."
Clinton v. State, 53 Fla. 98, 104, 43 So. 312, 315 (1907) (emphasis supplied). Although James Burney was older than fourteen chronologically, his mental age was that of a child unable to master reading and writing. Cf. McKinnies v. State, 315 So.2d 211 (Fla. 1st DCA 1975) (conviction reversed because mentally retarded sixteen-year-old was permitted to testify).
Our sister court recently reversed convictions predicated on the testimony of witnesses who were seventeen and eighteen years old, on grounds "[t]he trial judge failed to make the specific determinations necessary to find these mentally challenged youth competent." Hammond v. State, 660 So.2d 1152, 1156 (Fla. 2d DCA 1995). As the majority concedes, a "competency determination is of heightened importance when the witness is mentally retarded, because there might exist a tendency on the part of the jurors to believe that the retarded are not capable of conniving or fabrication." Id.
The trial judge in Lloyd v. State, 524 So.2d 396, 399-400 (Fla.1988) heard experts after they had examined a five-year-old witness whose competence to testify was at issue.
The judge, prosecutor, and defense attorney all questioned the child. The defense expert also testified at this proceeding. The court found Ryan understood the duty to tell the truth and found his testimony to be a matter of credibility for the jury. On May 7, 1984, the state's expert conducted an additional evaluation of Ryan, giving him the following six psychological tests: a Stanford-BinetLM; a Peabody Picture Vocabulary TestRevised Form L; a Performance Scale of the WISC-R; a Draw-A-Person Test; a Child's Sentence Completion Test; and a Three-Wishes Test. On May 15, 1984, the defense expert received the raw data from these tests. On May 17, 1984, the trial court granted the defense expert one hour to examine the child, justifying the limitation on the basis that the state's expert took only one hour for his examination, excluding the time necessary to give the above tests.
. . . .
... The record reflects that the trial judge heard testimony from experts regarding Ryan's ability to testify. He personally examined Ryan extensively. He found Ryan sufficiently intelligent to be capable of expressing himself concerning this matter and also found that Ryan understood his duty to tell the truth.
In affirming, the Lloyd court also "note[d] that most of the critical facts supplied by *1109 Ryan's testimony are either unrefuted or corroborated." Id. at 400.
The present case contrasts sharply with Lloyd. Here repeated requests that an expert be appointed to examine the witness were denied. No court-appointed expert performed psychological testing. In the present case, the trial judge did not examine the witness. Neither the trial court nor counsel examined the witness specifically to determine his competence. Mr. Burney's trial testimony raised a question about the extent, if any, to which his interrogators had influenced his testimony, even if inadvertently. See Davis v. State, 348 So.2d 1228 (Fla. 3d DCA 1977), cert. denied, 358 So.2d 134 (Fla.1978). But the trial court made no finding that Mr. Burney, whose testimony was crucial, understood the nature of an oath or was sensible of any duty to tell the truth.
While discovery depositions came in evidence on the competency question at the pretrial hearing, the depositions did not deal directly with Mr. Burney's ability to understand the obligation of an oath (and did not afford the trial judge an opportunity to experience the four- or five-minute periods it allegedly took Mr. Burney to formulate answers to some of the questions). In the first deposition, it was revealed that Burney had given a false confession to a game violation, falsely implicating somebody else, as well. James Burney finished high school at age twenty unable to read or write. His "grades... even being in special education, were primarily Ds and Fs." He "achieved at that first, second, third percentile throughout his academic career, which is of course very low functioning."
The present case resembles Griffin v. State, 526 So.2d 752 (Fla. 1st DCA 1988); there, too, the trial court made no finding that the child witness whose competency was challenged understood the duty to tell the truth. We reversed in Griffin, "find[ing] the trial court erred in failing to determine the child's competency as a witness with reference to the statutory criteria." 526 So.2d at 756.
[A]pparently on the basis of the de minimis competency examination conducted at the beginning of the child's videotaped deposition, the trial court found the child was competent to testify "within the confines of what is reasonable for a four-year-old." This finding does not satisfy the criteria set forth in section 90.605(2), which require the trial court to determine whether "the child understood the duty to tell the truth or the duty not to lie." In interpreting this statute, Florida courts have held that it is the duty of the trial court to determine whether the child was capable of observing, recollecting, and narrating facts, and whether the child had a moral sense of the duty to tell the truth.
Id. at 755. Accord M.C. v. State, 21 Fla. L. Weekly D2191, ___ So.2d ___ [1996 WL 571168] (Fla. 1st DCA Oct.8, 1996); Fuller v. State, 669 So.2d 273, 274 (Fla. 2d DCA) (reversing conviction where "the voir dire examination failed to establish that C.W. [a child witness] had the `moral sense of the obligation to tell the truth'"), review denied, 675 So.2d 929 (Fla.1996).
Adult witnesses, too, must have "sufficient understanding to comprehend the nature and obligation of an oath, ... [as well as] mental capacity ... [to] understand and intelligently answer questions propounded....' 58 Am. Jur., Witnesses, § 121." Florida Power & Light Co. v. Robinson, 68 So.2d 406, 413 (Fla.1953). While the trial court found that James Burney could answer the questions propounded to him in an intelligible way, and distinguish truth from falsehood, there was no finding that he had a moral sense of the duty to tell the truth or that he had the ability to understand "the nature and obligation of an oath." On this record, the lack of such a finding requires reversal. Z.P. v. State, 651 So.2d 213 (Fla. 2d DCA 1995); Coney v. State, 643 So.2d 654 (Fla. 3d DCA 1994).
The trial court never explored this topic with the witness. To be sure, the trial court is not required to make such inquiry in every case. In an appropriate case, doubt about a witness's competence may be dispelled by "the clear and coherent manner in which [a witness's] testimony was given, and his evident capacity as a witness. State v. Palmer, 206 Minn. 185, 288 N.W. 160 [1939]." Robinson, 68 So.2d at 413. But James Burney's *1110 testimony was not so clear and coherent nor his capacity as a witness so evident here that the need to examine him as to his understanding of an oath (or to examine people acquainted with him or experts who had evaluated him) was obviated.
The rule is that "`competency may be ascertained by an examination of witnesses acquainted with [the witness whose competence is in question], or by a personal examination of him * * * at the discretion of the court.' Id. sec. 124." Robinson, 68 So.2d at 413. "In this regard, ... medical testimony in respect to [a witness's] mental and physical condition" may also be looked to. Id. To similar effect, the Griffin court said:
In fulfilling that duty, the trial court may examine the child personally, or may determine the child's competency on the basis of the examination conducted by the attorneys. In addition, in applicable circumstances, the trial court may rely on the testimony and reports prepared by experts regarding the child's ability to testify. See, generally, Lloyd v. State, 524 So.2d [396 (Fla.1988)] at 400.
Griffin, 526 So.2d at 755. James Burney was not examined at the pretrial competency hearings, and no expert who testified was permitted to interview him. His testimony at trial went to the merits of the case, not specifically to his competency as a witness. In Coney, a competency determination was held error in part because the "trial court did not personally interview the [witness], but merely ... listened to a doctor's opinion about the [witness] ... based upon an examination of the [witness] which occurred approximately one year prior to trial." 643 So.2d at 655. The experts here did not have as much access to the witness as the Coney court found to be insufficient there.
While the record does not adequately establish James Burney's competence as a witness, neither does it rule out the possibility that adequate inquiry and findings might demonstrate his competence. These convictions should be reversed and the case should be remanded for a new trial "in order that the ends of justice might be served." Bell, 93 So.2d at 578. "On remand, the trial court [should be] directed to determine [Burney]'s competency as a witness in accordance with the statutory criteria, as a predicate to admission of [hi]s testimony." Griffin, 526 So.2d at 759.
NOTES
[1] In People v. King, 41 Colo.App. 177, 581 P.2d 739 (1978), the witness was allegedly "mentally immature," had a "vivid imagination," was "subject to flights of fancy," and had "fantasies concerning sexual contact and relationships." The appellate court, noting the wide discretion given to trial courts in evidentiary and witness issues, held that these allegations alone were insufficient to compel testing. In State v. Kahinu, 53 Haw. 536, 498 P.2d 635 (1972), cert. denied, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973), the Hawai'i Supreme Court noted that the mere possibility that a "key witness ... was fabricating his story ... was neither sufficient nor compelling grounds for such examination." Id., 498 P.2d at 642 (citing Ballard, supra).